PEOPLE, *ex rel.* ATTORNEY GENERAL, *v.* MICHIGAN CEN-
TRAL RAILROAD CO..

1. EQUITY—STALE DEMANDS—STATUTE OF LIMITATIONS—APPLICA-
TION IN EQUITY.

Courts of equity generally apply the statute of limitations by
analogy in cases where the remedy in equity is concurrent
only, or a substitute for an action at law.

2. RAILROADS—TAXATION—SPECIAL CHARTER — LIEN — NATURE —
LIMITATIONS.

The lien of the State for the taxes imposed upon the Michigan
Central Railroad Company by its special charter, Act No. 42,
Laws 1846, is a contract lien, in the nature of a mortgage, as
distinguished from a mere floating tax lien, and is not barred
by the lapse of any less time than will suffice to defeat a mort-
gage lien.

3. CORPORATIONS — SPECIAL CHARTERS — ACCEPTANCE — OBLIGA-
TIONS CREATED.

A special charter creating a corporation may be likened to a
deed poll, the acceptance of which by the grantee raises a
presumption of assent to the obligations therein imposed,
whence the duty to perform those obligations is not imposed
by law, but arises from express contract.

4. RAILROADS—TAXATION—SPECIAL CHARTER—LIEN—NATURE.

The taxes due from the Michigan Central Railroad Company
each year under its special charter, Act No. 42, Laws 1846,
became due each year without any act of the State officers,
and nothing in the nature of an assessment as a condition
precedent to the attachment of the lien for the tax existed or
was contemplated.

5. EQUITY—STALE DEMANDS—STATUTE OF LIMITATIONS—APPLICA-
TION IN EQUITY.

Where the law gives a choice of remedy, the one an action of
assumpsit and the other a proceeding in rem, equity will not
permit the statute of limitations to be evaded by resort to the
latter remedy.

6. EVIDENCE—JUDICIAL NOTICE—AIDING DEMURRER.

The court will not take judicial notice of public records for the
purpose of aiding a demurrer to a bill to the extent of finding

the facts contrary to the averments of the bill and admitted to be true by the demurrer. GRANT, J., dissenting.

7. STATUTES—CONSTRUCTION—CANONS—CONTEMPORARY CONSTRUCTION.

For the purpose of aiding in the construction of a statute the court may revert to the history of the times and ascertain by such records as courts are authorized generally to take judicial notice of what construction has been adopted by other departments of the government.

8. SAME—AMENDMENTS—CONSTRUCTION.

An amendment to a statute will generally be considered as a part of the original act and the entire act as amended be given the construction which would be given it if the amendment were a part of the original act.

9. SAME—CONTEMPORARY CONSTRUCTION—RAILROADS—TAXATION —SPECIAL CHARTER.

The practical construction of the special charter of the Michigan Central Railroad Company given by the executive and legislative branches of the government for many years is decisive of the legislative intent that the company should pay taxes to the State only on that portion of its capital and loans used within the State.

Appeal from Ingham; Wiest, J. Submitted January 3, 1906. (Docket No. 2.) Decided July 23, 1906.

Information by the people of the State of Michigan, on the relation of Charles A. Blair, attorney general, against the Michigan Central Railroad Company for an accounting. From an order overruling a demurrer to the information, defendant appeals. Affirmed.

The Michigan Central Railroad was incorporated by Act No. 42 of the Laws of 1846, entitled:

" An act to authorize the sale of the Central Railroad, and to incorporate the Michigan Central Railroad Company."

This act, with the amendments hereinafter noted, continued to constitute the charter of the company until in December, 1901. The company, acting voluntarily under

section 6225, 2 Comp. Laws, reincorporated under the general laws of the State. As by the terms of the last named section the new company remained liable for all indebtedness of the old, and as all liens were preserved and continued, the claims involved in this proceeding, which arose before the reincorporation, are predicated upon and are to be determined by the provisions of the charter of 1846, and its amendments. The three sections of the charter material to our present inquiry read as follows:

"SEC. 32. The directors of said company shall annually on or before the twenty-fifth day of January, make a report to the secretary of State, which shall embrace the business of the preceding year, to the first day of January, stating the length of their road in operation, cost of construction, and the indebtedness of the company for materials or work in progress of delivery or execution on account of construction, as near as can be conveniently ascertained, and all other indebtedness, if any there be, the amount of capital stock subscribed, and the amount actually paid in, and all loans made for the purposes mentioned in the next succeeding section, the amount of dividends, receipts from freight, from passengers, and from all other sources on account of operating the road, the number of through and way passengers respectively, the expenditures for the repairs of the road; for repairs of engines and cars, and other expenditures, which three items last mentioned shall include all the expenditures for operating the road, and the expenditures made for construction during the year, the number of engines, of passenger, freight and other cars, the average number of men in employment of the company, the number of miles run by passenger, by freight and other trains; which report shall be verified by the affidavit of at least two of the directors, and filed in the office of the secretary of State.

"SEC. 33. The said company shall pay to the State an annual tax of one-half of one per cent. upon the capital stock paid in, including the two millions of purchase money paid to the State, until the first day of February, eighteen hundred and fifty-one, and thereafter an annual tax of three-fourths of one per cent. upon its capital stock paid in, including the two millions of purchase money paid to the State, and also, upon all loans made to said

company, for the purpose of constructing said railroad or purchasing, constructing, chartering, or hiring of the steamboats authorized by this act to be held by said company, which tax shall be paid in the last week in January in each year, to the State treasurer, and the property and effects of said company, whether real, personal or mixed, shall, in consideration thereof, be exempt from all and every other tax, charge and exaction, by virtue of any laws of this State now or hereafter to be in force, except penalties by this act imposed.

"SEC. 34. The State shall have a lien upon the railroad of said company and its appurtenances and stock thereon, for all penalties, taxes and dues which may accrue to the State from said company, which lien of the State shall take precedence of all other debts or demands, judgments or decrees against said company; and the citizens of this State shall have a lien upon all the personal property of said company for all dues or demands against said company to the amount of one hundred dollars, originally contracted within this State, which, after said lien of the State shall take precedence of all other debts or demands, judgments or decrees, liens or mortgages against said company."

By an amendment to the charter, made April 3, 1848 (Act No. 197, Laws 1848), and assented to by the railroad company, the railroad company was authorized to aid and assist any incorported railroad company or companies authorized and having the power to build a railroad from the southerly line of the State near Lake Michigan to Chicago, in the construction, maintenance, and operation of any such railroad, to connect the railroad of the Michigan Central Railroad Company with Chicago, and to make loans to and guarantee loans of any such company or companies. By further amendment, made February 13, 1855 (Act No. 139, Laws 1855), and assented to by the railroad company, permission was granted to increase the capital stock from time to time to an amount necessary to cover the cost of the construction, completion, equipment, operating, and keeping up their road, and its connections, and to lay down a double track, for the same and both within and without said State, and also to issue bonds

from which to pay any debts incurred or to be incurred for such purposes, and to sell said stock and bonds at such rates as might be approved by the directors. By a further amendment made May 31, 1893 (Act No. 179, Pub. Acts 1893), and assented to by the railroad company, the provision for a tax upon the stock and loans was changed and a tax upon the gross income of the company was substituted therefor.

The information in this case is filed by the attorney general, on behalf of the State, for an accounting, and praying that a lien be declared in favor of the State for taxes which have accrued under the charter and remain unpaid. The information avers that from and after the year 1854 the directors of the company did not, in accordance with the provisions of section 32, make the report to the secretary of State embracing the various items therein mentioned and set forth, but designedly made reports not in accordance with the requirements of said section, and omitting some of the items therein embraced, and making false, fraudulent, deceptive, and misleading statements with respect to other items thereof. That the amount of the capital stock of the company subscribed and actually paid in was not truly and fully set forth in said report, but in each report only a portion thereof was reported, and also that the amount of all loans made for the purposes mentioned in section 33 were not fully reported, but that the reports in this respect were false, fraudulent, and misleading. That the company did not pay the State during years from 1854 to 1893 (when the basis of taxation was changed) the tax actually due, but instead made payments on the basis of the false reports made as above stated. The information states in detail the amount of discrepancy for the different years " as nearly as can be ascertained." The aggregate of the unpaid taxes as thus shown is about $4,000,000, exclusive of interest. The information further avers:

"That all the records, books of account, documents, files, reports, correspondence, and papers of the said Mich-

igan Central Railroad Company as originally incorporated, passed to, and became the property of, said defendant, and are now in the possession of said defendant, and that therefrom a true and just account can be rendered, and made of all and singular the fully paid capital stock of said company from time to time outstanding, and of all loans made to said company for the purposes mentioned and set forth in said section 33 of said charter, but that the same, except as so falsely and fraudulently reported by said company from time to time as before set forth, are and were unknown to said State of Michigan, and the knowledge thereof was fraudulently concealed by said company from said State, and that the information herein set forth and contained, has recently and within six months prior to the filing of this information, come to the attention and knowledge of the relator, who brings the same with the approval of the governor of the said State, to the knowledge of the court as herein set forth."

This information was demurred to, the demurrer assigning two grounds, viz., the statute of limitations and laches. From an order overruling this demurrer defendant appeals.

*O. E. Butterfield* (*Benton Hanchett, Henry Russel, Henry M. Campbell,* and *Ashley Pond,* of counsel), for appellant.

*John E. Bird,* Attorney General (*Otto Kirchner* and *Thomas E. Barkworth,* of counsel), for appellee.

MONTGOMERY, J. (*after stating the facts*). While courts of equity are not within the words of the statute of limitations, it is generally held that they should by analogy apply the statute in any case where the remedy in equity is concurrent only or a substitute for an action at law. 1 Story on Equity Jurisprudence, § 529; *Jenny* v. *Perkins,* 17 Mich. 28; *Smith* v. *Blindbury,* 66 Mich. 325; *Allen* v. *Conklin,* 112 Mich. 74.

It is the contention of the defendant in this case that the present proceeding is a remedy concurrent with an action of assumpsit on the law side of the court, and that

as the last item involved became due more than six years before the institution of this proceeding the demurrer should be sustained unless the delay is excused by the averments of the information as to fraudulent concealment of the cause of action by the defendant.

The complainant, on the other hand, contends that the present proceeding is not a substitute for an action of assumpsit but is a proceeding to enforce a contract lien; that resort to equity is essential, and that the remedy here sought is in all respects to be treated as bearing an analogy to a foreclosure of a mortgage. It will aid to a solution of this question to consider the character of the claim upon which the proceeding rests.

The defendant's counsel contend that the lien provided by the statute of 1846 is to be treated as a tax lien, and merely a remedy provided by statute, a mere floating lien. The case of *Auditor General* v. *Railroad Co.*, 82 Mich. 426, is cited in support of this view. In that case the general statute [Act No. 64, Laws 1848] providing that, "in all cases when any incorporated company hereafter to be incorporated is made subject to the payment of a specific State tax, this State shall have a lien on all the property of said company, to secure the payment of said tax, which lien shall take precedence of all other liens or incumbrances whatever," was considered. A lien was claimed for the specific tax for 1879, 1880, and 1881. At the time of a sale of the railroad property to the defendants no tax for the year 1881 had been assessed. The taxes had been regularly assessed for the years 1879 and 1880. It was held that a lien existed for these years, but that the lien for the taxes of 1881 had not attached.

We think there is an essential difference between the general statute and the defendant's charter. Under the general statute there could in the nature of things be no tax until an assessment was made. The tax was not the subject of agreement, but was imposed without assent. It was rightly held that the lien did not attach until the authorities had determined the amount, and

while this circumstance would not in itself determine whether the obligation to pay the tax was a contract obligation, it is significant as bearing on another phase of the question under discussion that Mr. Justice GRANT likened the lien established by assessment to a mortgage upon the property of the company. . The defendant's charter is a contract. It is said by defendant's counsel that it was not a contract inter partes, but in the nature of a deed poll, and is said to be a contract created by law. What seems to us a preferable statement is that the law presumes assent to the terms of a contract contained in a deed poll from its acceptance by the grantee. The law does not in such case *impose* a contract upon the party, but by the acceptance of a deed poll the grantee becomes an assenting party to its terms and the contract is an express one. *Crawford* v. *Edwards*, 33 Mich. 354; *Winans* v. *Wilkie*, 41 Mich. 266; *Terry* v. *Durand Land Co.*, 112 Mich. 668. There was an acceptance of the terms of this charter by the company by its purchase from the State as effectual to create an express contract as would have been a signed agreement. This contract being express and in express terms providing a lien for taxes reserved, which taxes became due once each year without any act of any State officers, it is clear that no condition precedent to the lien attaching existed or was contemplated. All duty rested with the company; as much so as if the reservation had been termed interest or a franchise fee. The lien, as was said in *Auditor General* v. *Railroad Co.*, supra, "is similar to a mortgage which in general terms includes all the property of the company."

Is this lien defeated by the fact that an action of assumpsit cannot now be maintained? As stated above, if the remedy in equity is but a substitute for the action of assumpsit, the action is too late. So, if the *law* gives a choice of remedy, the one an action of assumpsit and the other a proceeding in rem, it should not be permitted that the statute of limitations be evaded by resorting to the latter remedy. Such a case was that of *Borst* v. *Corey*,

15 N. Y. 505, which was an action by a vendor of land to enforce a vendor's lien. This case was considered, and what we conceive to be the true distinction noted in the later case of *Hulbert* v. *Clark*, 128 N. Y. 295 (14 L. R. A. 59). Earl, J., speaking of the case of *Borst* v. *Corey*, said:

"It was held that an action to enforce the equitable lien for the purchase money of land was barred by the lapse of six years after the debt accrued. The reasoning by which the result was reached in that case is not altogether satisfactory, and yet that decision is not in conflict with the views we now entertain. The judge there writing the opinion said:

"'The equitable lien (for the purchase money) is neither created nor evidenced by deed but arises by operation of law, and is of no higher nature than the debt which it secures.'"

This marks also the distinction between the present case and the case of *Borst* v. *Corey*. If it be said that this lien was created by law, i. e., by legislative enactment, it is also to be said that that legislative enactment was something more than a statute. It was a contract as well. When this is said the reasonable analogy is between this lien and a mortgage lien, and the lien should not be held defeated by the lapse of any less time than suffices to defeat a mortgage lien. *Mayor, etc., of New York* v. *Colgate*, 12 N. Y. 140; *Hardman* v. *Boyd*, 113 U. S. 756; *Belknap* v. *Gleason*, 11 Conn. 160; *Hulbert* v. *Clark*, supra. It follows that, as the demurrer is to the whole bill, it cannot prevail on this ground.

Thus far we have dealt with the question as it presents itself based upon the bill itself. It is, however, contended that this pleading is to be construed in connection with certain facts of which the court should take judicial notice, and that the reports of the company and proceedings had thereon show that the delay of the State is not excused, and that the State should be held estopped by laches. It is also contended that by reference to the same sources of information it is made to appear that there has been no

concealment from the officers of the State of any cause of action or right that the State may have had which is prima facie barred, and that such records and reports show that the alleged discrepancy between the amount of capital stock and loans reported for taxation and the total assessment of the actual capital stock and loans arises out of the fact that the company from the first reported the amount of stock and loans used in constructing its railroad within the State only, and that this fact was well known to the executive officers of the State and to the legislature, and that such construction has been acted upon during the entire existence of the company.   Upon full consideration we are convinced that these questions should not be determined on demurrer to the information.   A case in point is *Griffing* v. *Gibb*, 2 Black (U. S.), 519, in which it was held that the court will not take judicial notice of the laws of a State which would in a proper state of pleadings be judicially noticed to meet proper averments in a pleading answered only by demurrer, or, in effect, that a demurrer will not be aided by facts of which the court is required to take judicial notice to the extent of requiring the court to find the fact against a direct admitted averment.   Numerous cases are cited in which courts have taken judicial notice of public documents, but we have encountered none which is opposed to the rule in *Griffing* v. *Gibb*.

Closely related to this question is that which relates to the force and effect to be given to the practical construction given to this statute by the executive and legislative departments of the State.   While the averments of the bill are not sufficiently met by a demurrer for the reason that we are not at liberty to negative positive averments by taking judicial notice of facts which contravene the averments of the bill, and for the further reason that the alleged discrepancy could not in any event be thus shown to have occurred solely by a failure to report the capital and loans employed in construction without the State, the proper construction of this statute and a determination of

the question of whether such capital so employed is subject to the tax reserved is of supreme importance to the case, and it is essential to the guidance of the court below in the trial that the question be finally determined. For the purpose of aiding in the construction of the statute the court may revert to the history of the times and ascertain by such records as courts are authorized generally to take judicial notice of what construction has been adopted by other departments of government. It appears from these that to the knowledge of the executive department, of the legislative and legal departments of the State, and with the full approval of the latter, the defendant has for half a century or more reported for taxation only such capital and loans as were employed in constructing a railroad within the State. The State invokes the general rule of construction of amendments to statutes, viz., that such amendment is to be considered as a part of the original act, and the entire act as amended must in the future be given the same construction as if the amendment was a part of the original act. While we fully recognize the force of this rule, it is not, as pointed out in the opinion of Mr. Justice GRANT, an unyielding rule of construction.

We are of the opinion that the practical construction of the executive and legislative branches of government so long continued should be held decisive of the legislative intent, and upon this question assent to the reasoning of Mr. Justice GRANT.

McALVAY, OSTRANDER, HOOKER, and MOORE, JJ., concurred with MONTGOMERY, J.

GRANT, J. The following statement, made by counsel for the defendant, is accurate, in so far as it goes, and I adopt it:

"This is a suit by the State of Michigan, begun by information filed by the attorney general, to recover from the defendant the amount of taxes alleged to have accrued to the State under the charter of the Michigan Central Railroad Company as originally organized, for the years 1855

to 1893, both inclusive, for which defendant is alleged to
be liable as successor of said original company under the
provisions of section 6225 of the Compiled Laws of 1897;
said original company having reorganized under the same
name under the provisions of said section.   The defendant
demurred to the information upon the ground that the suit
is barred by the statute of limitations and by laches.   The
court below overruled the demurrer, and defendant ap-
peals.

"The Michigan Central Railroad Company was organ-
ized in 1846, under a charter granted by the legislature of
the State.   The charter was granted to enable the railroad
company to purchase from the State the railroad which
the State had projected, to extend from the city of Detroit
to the State line on or near Lake Michigan, and had built
as far as Kalamazoo.   It appears by the information that
the company paid taxes each year during the period in
question, and was never charged with being delinquent
until the filing of this bill.   It was provided in the charter
that an annual report should be made to the secretary of
State which should state among other things the amount
of capital stock outstanding and the amount of all loans
for construction; that the company should pay a specific
tax on the capital stock and loans for construction; and
that the State should have a lien upon the railroad for the
taxes which might accrue to the State from said company.
Section 22 provided that the capital stock should be $5,-
000,000, with the privilege of increasing the amount to
$8,000,000, and of commencing business whenever $2,-
000,000 was subscribed.   There was no provision for the
construction of the railroad outside of the State.

"The provisions with respect to the reports, taxes, and
the lien, are as follows:

"'SEC. 32. The directors of said company shall annually, on or
before the 25th day of January, make a report to the secretary of
State, which shall embrace the business of the preceding year to
the first day of January, stating the length of their road in opera-
tion, cost of construction, and the indebtedness of the company for
materials or work in progress of delivery or execution on account
of construction, as near as can be conveniently ascertained, and all
other indebtedness, if any there be; the amount of capital stock
subscribed, and the amount actually paid in; and all loans made
for the purposes mentioned in the next succeeding section; the
amount of dividends; receipts from freight, from passengers, and

from all other sources on account of operating the road; the number of through and way passengers respectively; the expenditures for the repairs of the road; for repairs of engines and cars, and other expenditures; which three items last mentioned shall include all the expenditures for operating the road and the expenditures made for construction during the year; the number of engines, of passenger, freight and other cars; the average number of men in employment of the company; the number of miles run by passenger, by freight and other trains, which report shall be verified by the affidavit of at least two of the directors, and filed in the office of the secretary of State.

" ' SEC. 33. The said company shall pay to the State an annual tax of one-half of one per cent. upon the capital stock paid in, including the two millions of purchase money paid to the State, until the first day of February, eighteen hundred and fifty-one, and thereafter an annual tax of three-fourths of one per cent. upon its capital stock paid in, including the two millions of purchase money paid to the State, and also upon all loans made to said company, for the purpose of constructing said railroad, or purchasing, constructing, chartering or hiring of the steamboats, authorized by this act to be held by said company, which tax shall be paid in the last week in January in each year, to the State treasurer, and the property and effects of said company, whether real, personal or mixed, shall, in consideration thereof, be exempt from all and every other tax, charge and exaction, by virtue of any laws of this State now or hereafter to be in force, except penalties by this act imposed.

" ' SEC. 34. The State shall have a lien upon the railroad of said company, and its appurtenances and stock thereon, for all penalties, taxes and dues which may accrue to the State from said company, which lien of the State shall take precedence of all other debts or demands, judgments or decrees against said company; and the citizens of this State shall have a lien upon all the personal property of said company for all dues or demands against said company to the amount of one hundred dollars, originally contracted within this State, which, after said lien of the State, shall take precedence of all other debts or demands, judgments or decrees, liens or mortgages against said company.'

" By an amendment to the charter made April 3, 1848, (Act No. 197, Laws 1848), and assented to by the railroad company, the railroad company was authorized to aid and assist any incorporated railroad company or companies, authorized and having the power to build a railroad from the southerly line of the State near Lake Michigan to Chicago, in the construction, maintenance and operation

of any such railroad, to connect the railroad of the Michigan Central Company with Chicago, and to make loans to and guarantee loans of any such company or companies. By further amendment made February 13, 1855 (Act No. 139, Laws 1855), and assented to by the railroad company, permission was granted to increase the capital stock from time to time to an amount necessary to cover the cost of the construction, completion, equipment, operating, and keeping up their road, and its connections, and to lay down a double track, for the same and both within and without said State, and also to issue bonds from which to pay any debts incurred or to be incurred for such purposes and to sell said stock and bonds at such rates as might be approved by the directors. By a further amendment made May 31, 1893 (Act No. 179, Pub. Acts 1893), and assented to by the railroad company, the provision for a tax upon the stock and loans was changed and a tax upon the gross income of the company was substituted therefor.

" As above stated, the period covered by this suit extends from 1855, the time when the company was granted permission to increase its capital stock and to issue bonds to cover the cost of construction, etc., of its road and connections within and without the State, to 1893, the time when it became subject to a specific tax upon its gross receipts. It appears from the information that the company regularly made reports to the secretary of State, which, upon their face, appeared to be under and in compliance with section 32, but it is alleged that the company did not, after 1854, pay the amount of taxes which it was required to pay, and paid only upon the amount of capital stock and loans alleged to have been falsely, deceptively, and fraudulently reported as being the amount of such capital stock and loans, leaving unpaid from year to year amounts which should have been paid on account of capital stock and loans not reported. The information states the amount of capital stock, and loans reported from year to year and the amount of stock and loans which it alleges should have been reported, and the taxes paid from year to year and the amount which it alleges should have been paid, showing an alleged deficiency of about $4,000,000. It is further alleged that the information upon which the allegations are based had been fraudulently concealed by the company from the State and had come to the knowledge of the relator within six months prior to the beginning of the suit.

" The following relief is sought:

"1. That the said defendant may come to a just, full and true account with the said State of Michigan as to the sums from year to year outstanding of capital stock fully paid in of said The Michigan Central Railroad Company, and of loans made to said company for the purposes of constructing its said railroad or purchasing, constructing, chartering or hiring of the steamboats authorized by its said charter to be held by said company.

" 2. That the said defendant company may be decreed to be indebted to the said State of Michigan in such sum as may be found by said court upon such accounting as aforesaid, to be due and owing on account of said nonpayment of taxes as before set forth, and the interest thereon, and that the said defendant may be decreed to pay the same to the State of Michigan.

"3. That a lien may be decreed and established in favor of said State of Michigan for the sums as aforesaid found to be due and owing from said defendant to said State, on account of said taxes so remaining unpaid as aforesaid, and the interest thereon.

" 4. That in default of the payment by said company of the amount so found to be due, the lien of said State upon said railroad, appurtenances, and property may be enforced."

Any further reference to the facts which I deem essential will be made in connection with the points discussed.

1. I deem it important to state some legal principles, and some further facts which are preliminary and essential to the determination of the main issues. Courts, in the determination of matters involving the acts of public officials and construing contracts between the State and its citizens, will take judicial notice of public documents, of reports of public officers, of the acts of public officials, and of reports required by law from citizens of the State with whom it contracts, to be presented to, and filed with, the officers of the State. Courts will consult them as freely as they would if they were stated in pleadings or introduced in evidence. While this rule is well established, I refer to the following decisions: *Kirby* v. *Lewis*, 39 Fed. 66, 77; *Romero* v. *United States*, 1 Wall. (U. S.) 721, 742; *United States* v. *Teschmaker*, 22 How. (U. S.) 392,

405; *Lerch* v. *Snyder*, 112 Pa. 161; *People* v. *Williams*, 64 Cal. 87; *Worcester Nat. Bank* v. *Cheney*, 94 Ill. 430; *Brown* v. *Piper*, 91 U. S. 37; 17 Am. & Eng. Enc. Law (2d Ed.), p. 915; *Jones* v. *United States*, 137 U. S. 202, 216. I do not think that *Griffing* v. *Gibb*, 2 Black (U. S.), 519, is conclusive of the question. The bill in that case was filed to enjoin the defendant from filling a part of the bay in San Francisco in front of the complainant's land. Upon the general demurrer the question was raised whether the court should judicially notice the acts of California relating to the harbor of San Francisco. The complainant made a case without any reference to the statute. If complainant had referred to some right under the statute evidently he would then have made the statute a part of the pleading and challenged the court's attention to it.

In this case complainant has taken his statements from the reports on file in the public offices of the State. The information in this case is based partly, if not wholly, upon those reports. A litigant may not select from reports and documents on file in the public offices so much thereof as he deems essential to make a case and thereby exclude, even upon demurrer, his opponent and the courts from examining the entire records and documents in determining whether he is entitled to relief. It follows that the questions here raised must be determined in the light of the acts of State officials and of the defendant for 50 years, as found in the reports and records they have made in accordance with the law. I cannot well conceive a case which better illustrates the soundness and justness of this rule than does this. The parties to this contract could act only through their officials and agents. It was contemplated and required that their reports and acts should be made matters of public record. The most of the officials and agents of both parties are dead. They can now only speak through the official records they have left in the places designated by law. One of the purposes of these records is to preserve evidence.

It appears from the report of the auditor general for the year ending December, 1852 (page 11), that the right of the State to tax capital stock and loans invested out of the State was then raised, and that the State, through its proper officer, before deducting the amounts invested outside the State, evidently under the amendment of April 3, 1848, obtained the opinion of the attorney general upon the subject. The report reads:

" The tax for the year 1852, paid by this company (the Southern R. R. Co.), as well as the tax on the Central Railroad Company, was based upon the capital stock paid in and loans made, deducting the amounts expended out of the State. The opinion of the attorney general was procured previous to deducting this amount."

The same report contains a table in which is the following:

Amount of Capital Stock.

| | |
|---|---:|
| Michigan Central | $6,928,362 57 |
| Less amt. invested in Indiana | 588,917 32 |
| | $6,339,445 25 |
| Three-fourths of 1 per cent. on this last amount would be | 47,545 84 |

—which is the amount of tax paid as above pointed out.

The following year some dispute arose as to the amount of the tax, and the auditor general reports:

" I then received a supplemental report from the company showing the amount expended out of the State, and an offer to pay the balance after deducting the amount so expended, with interest, together with all expenses that had accrued. This offer was accepted." Rep. of Aud. Gen. 1853, p. 13.

Acting evidently under the authority of 1 Comp. Laws, §§ 4023, 4024, the secretary of State, upon the receipt of the annual reports from the defendant, filed them from time to time with the auditor general, who attended to the assessment and collection of this tax, together with all specific taxes. These reports of the defendant are now, with a few exceptions, on file in the office of the auditor general, and were used by him in making up his

annual reports. In 1873 an act was passed for the appointment of a railroad commissioner, and his duties prescribed by law. 2 Comp. Laws, § 5206. He was to make annual reports to the governor and lay them before the legislature. Every year after that until 1893 in his annual report to the governor of the State the commissioner reported the number of miles of this road in Michigan, Indiana, and Illinois, the cost of the entire road, the cost in Michigan and out of Michigan, and the total amount of the capital stock paid in, and the total amount thereof expended in Michigan. For instance, the report of the commissioner, dated October 31, 1874, states the terms of the charter, the amendment of 1855 regarding the capital stock, and the provision requiring the payment of taxes on its stock paid and loans made. It gives the length of the road in Michigan, 221 miles; its length in Indiana and Illinois, 49 miles; cost of the entire road, $18,018,997.16; the proportion of the stock of the road in Michigan, $13,928,684.80. It states the proportion of the capital stock paid in for Michigan, $14,484,631.69, the exact amount reported by the company for taxation the same year. It gives also the total amount of the debt, and the proportion of the debt for Michigan. Rep. of Railroad Com'r, 1873, pp. xvi, 135, 136.

The report of the auditor general to the legislature for the same year states:

"The Michigan Central Railroad Company pays annually $126,794.40, this being a tax of three-fourths of 1 per cent. upon $13,905,920.60, paid-in capital stock, and $3,000,000 loans of the company, or upon a total of $16,905,920.60; this amount being the proportion of the capital stock, and loans to the company, including the two millions of purchase money paid to the State, expended within the State, for the purpose of constructing its road, or purchasing, constructing, chartering, or hiring steamboats authorized by its charter, as reported by the officers of said company." Aud. Gen. Rep. 1874, pp. cxv, cxvi, cxxiii.

Similar reports were made every year by the commis-

sioner of railroads.   The law [Act No. 157, Laws 1873] required these reports to be published by the thousand and distributed, 400 to the senate, and 1,100 for the use of the house of representatives.   They were also to be furnished other officials of the State, and placed in every public library.   The secretary of State was directed to oversee the distribution of these reports and documents.   Governor Bagley, in his message of January 7, 1875, referred to the report of the commissioner for the year ending December 31, 1873, as before the legislature.   Governor's messages for 1875.   The same governor, in his message to the legislature January 3, 1877, called attention to the manner in which these taxes were levied and paid, "on the basis of the value of the property in the limits of the State." Governors' Messages 1874–1882, p. 22.

In 1883, by an act of the legislature, the commissioner of railroads, Hon. W. P. Innes, State treasurer, Hon. E. H. Butler, and secretary of State, Hon. H. A. Conant, were appointed a commission to inquire into the desirability and practicability of the purchase of the Michigan Central Railroad.   Their report shows that they examined the records from 1852 to 1884, and compared the taxes paid under the special contract with the Michigan Central Railroad with the amounts paid under the law governing other railroads.   In that report I find the following:

"We have thus far only viewed the question of alteration or amendment from the standpoint of today.   Let us go back as well, to and before the sale of the roads, when we find that the properties were purchased in good faith, at a time when business was almost nothing as compared to what it has been in more recent years; that in selling, the State disposed of properties it wished decidedly to be free from; that for some time at least one of the roads (Michigan Central) paid into the State as an annual tax, a sum far in excess of the amount more recent legislatures have thought just and proper to be paid by the present general law companies; that while, at intervals, the special provisions as to taxation have been in favor of that road, for the whole course of years they have been to the advantage of the State."   Governors' Messages, 1883–1897.

This report was communicated to the legislature by Governor Begole January 7, 1885.

I have examined the reports made by defendant under the contract, which are on file in the office of the auditor general, and they also show the basis upon which these taxes were levied. Taking as an example the report for the year 1860, it recites that the company submits its annual report according to the provisions of their charter and the amendments thereto. Among other things it shows the following:

" *First.* The length of their road from Detroit to its western terminus at the line of Indiana is 221 miles.

" *Second.* The cost of constructing the same, $9,930,986.32.   *   *   *

" *Fourth.* The capital stock of the company, subscribed and actually paid in, $6,057,820.

" *Fifth.* The amount of loans made to said company for the purpose of constructing said railroad or purchasing, constructing, chartering, or hiring steamboats is $3,990,553.16.   *   *   *

" *Eleventh.* The expenses of the company for construction between Detroit and western terminus on State line during said year are included in the fifth item, and are nothing."

These reports on their face include the road in Michigan, and not outside. They leave no room for misapprehension. The taxes were computed and levied on the basis which was known to the auditor general (if not computed by him), to the governor, to the legislature, to the secretary of State, and to the railroad commissioner.

It is apparent from the information in this case, comparing the figures and statements there given, with the figures and statements in the reports above referred to, that the difference between the amounts reported for taxation by the defendant and the amounts now claimed, is the difference almost if not entire, between the two amounts thus reported. As to this difference it is apparent that the defendant not only did nothing to conceal the basis of taxation, or the total amount of its capital stock and loans, but, on the contrary, that it reported them

fully, claiming that under its contract it should not be taxed for moneys invested in property outside the jurisdiction of the State. As above stated, most of the men, officials and agents of the State and of the defendant, who made these reports, are dead, yet they as well as those living are charged in this information with making false, fraudulent, and deceptive statements in regard thereto, and with falsely and fraudulently concealing the facts from the State of Michigan. . With the above records in the archives of the State, in its libraries, in the possession of all the officers of State; with the basis on which the defendant paid taxes under its contract annually reported to the governors of the State, whose duty it is to see that the laws are enforced and its contracts carried out, with these statements annually before the legislature, the relator not only charges the officers of the defendant company with having made false, fraudulent, and deceptive statements for a period of nearly 40 years, but also charges these same officers with having committed perjury under 3 Comp. Laws, § 11306. That statute makes such a false affidavit perjury. Comment is unnecessary.

2. When the State enters into purely contractual relations with its citizens it should be bound by the same rules of construction that bind its citizens with whom it contracts. Why should not the same conduct of the agents of the State bind it as will bind the agent of a corporation or other citizen under the same contract? The State, of of all parties contracting, should deal fairly and honestly with its citizens. Under the maxim of monarchies that "The king can do no wrong," the statute of limitations did not apply to the king. Neither he nor the government could be guilty of any laches. These maxims and rules in their full extent no longer apply at least to republican governments. By statute in this State (3 Comp. Laws, § 9747), and statutes in most, if not all, of the States, the statute of limitations is made to apply to the State. So the State may be estopped by laches.

*State* v. *Railroad Co.*, 89 Mich. 481; *Michigan* v. *Railroad Co.*, 69 Fed. 116.

"Resolute good faith should characterize the conduct of States in their dealings with individuals, and there is no reason in morals or law that will exempt them from the doctrine of estoppel." *Indiana* v. *Milk*, 11 Fed. 389.

It was also held in *Walker* v. *United States*, 139 Fed. 409:

"When the sovereign comes into court to assert a pecuniary demand against the citizen the court has authority, and is under duty, to withhold relief to the sovereign except upon terms which do justice to the citizen or subject, as determined by the jurisprudence of the forum in like subject-matter between man and man."

I agree with the contention of the learned counsel for the relator, that the relations between the parties to this suit are those of contract pure and simple. This being so the rules of law in interpreting contracts must prevail. The State owned a partially constructed railroad. It was not a financial success. Negotiations were opened for a sale resulting in the contract made by Act No. 42 of the Laws of 1846. That act made and constituted 26 men, naming them, a body corporate by the name and style of the Michigan Central Railroad Company. The legislature was the proper and only party to make the contract on behalf of the State. The company was duly formed, accepted the terms, paid the money, and assumed the obligations of the contract, among which was the obligation to pay a tax. The parties to the contract are presumed to have used the word "tax" in its common meaning. The statute (1 Comp. Laws, § 50, subd. 1) expressly provides that "all words and phrases shall be construed and understood according to the common and approved usage of the language." What the reasons may have been for fixing a rate and basis of taxation is of no moment. Both parties recognized that a tax should be paid, and they, by mutual agreement, fixed a basis and a rate. It was not

only called a tax, but was to be assessed and paid "in lieu of all other taxes." If the contract had been silent as to taxes, an agreement to pay taxes upon the same basis upon which other similar property was taxed would have been implied, and been as binding as would an express agreement. There is an implied agreement between every citizen, corporate and natural, and the government that he will contribute his fair share to its support. It is immaterial that in the one case the tax is fixed by agreement, and in the other by proceedings in invitum. This question is, however, of little importance. I shall in this opinion call it a tax as did the parties to the contract.

3. By the contract evidenced by the act of 1846, and its acceptance, the State sold and the defendant bought a railroad entirely within the State of Michigan. Its termini were definitely fixed, one on the eastern, and the other on the western, border of the State. The defendant's sole authority to issue stock and borrow money was limited to the purchase, maintenance, and operation of the road in this State, and boats not exceeding eight in number, at its western terminus. The right of taxation was limited to its stock and loans expended for this purpose in this State, and in the purchase of property to be entirely located in this State. The company acquired no authority to issue stock or make loans for any other purpose. Any attempt to do so would have been ultra vires, and void. In the amendments of 1848 and 1855, authorizing the defendant to expend money and to issue stock and make loans for the purpose of obtaining interests and property outside the State, no reference whatever is made to taxation of property outside the State, or to the taxation of stock issued and loans made for that purpose. The State could not impose a tax upon the property of the company outside its jurisdiction, and could not without the express assent of the defendant tax the stock or loans which produced that property. *Delaware, etc., R. Co.* v. *Pennsylvania,* 198 U. S. 341; *Louisville, etc., Ferry Co.* v. *Kentucky,* 188 U. S. 385.

The State invokes, as the sole basis for the right to tax property outside its territorial jurisdiction, the rule of construction of amendments to statutes, viz., that such amendment is to be considered as a part of the original act, and the entire act as amended must in the future be given the same construction as if the amendment was a part of the original act. There is and can be no other basis for imposing this liability, or for holding that the parties to the contract agreed to it. As already shown, the original contract confined the defendant's road to this State and fixed a tax upon the property in this State. The tax was agreed to with reference solely to that property. The amendment contains no mention of taxation or of an intent to extend the power of taxation agreed to in the original contract. The tax provided by the original contract remained unaffected by the amendment. It is sought by implication to read into the contract additional burdens not referred to in either the original or amended contracts. The only right or power to tax the defendant's property outside the State's jurisdiction would be by agreement, by placing in the contract a condition for such taxation, which, of course, would be valid if accepted by the company. It, however, did nothing of the sort. In changing a contract by mutual consent of the parties no right will be taken away from or burden imposed upon either, unless the language making the change expressly takes away the one and imposes the other; or, unless such results follow by necessary implication. When common-law rights of person or property are invaded by statute, the statute must receive a strict construction. Endlich on Interpretation of Statutes, § 341. I think the same rule of construction should here apply. He who seeks to impose upon another either by statute or by agreement a new and heavy burden should be able to produce language unmistakably showing the intention to impose that burden, and leaving no reasonable basis to hold otherwise.

"Of two constructions equally warranted by the language of an amendment that is to be preferred which best harmon-

izes the same with the general tenor and spirit of the act amended." Endlich on Interpretation of Statutes, § 40.

See, also, 2 Lewis' Sutherland on Statutory Construction (2d Ed.), §§ 489, 490.

The general rule of construction as to amendments to general public acts does not apply with equal force to acts of a purely contractual character between the State and its citizens. The general rule of construction, however, is subject to other rules equally as well established. In *Hatch* v. *Calhoun Circuit Judge*, 127 Mich. 174, we said:

"The soundness of this rule * * * is not questioned. Other rules are as well established as this, viz.: That a statute 'must be construed with reference not only to its language, but its object, as gathered from its various parts.' *Washburn* v. *People*, 10 Mich. 372, 384. And that the primary object of all interpretation or construction is to ascertain the real intention of the legislature, and no specific or artificial rules of interpretation can be of any value which do not contribute to this end. *People* v. *Saginaw Circuit Judge*, 26 Mich. 342, 344. And that a statute must be so construed as, if possible, to give effect to all its provisions. *Swartwout* v. *Railroad Co.*, 24 Mich. 389, 400. In *Peninsular R. Co.* v. *Duncan*, 28 Mich. 130, 135, Justice Cooley said:

"'What we should seek here is the intention of the legislature, and not the testing by nice rules of art the language employed. It may possibly appear, as is too often the case, that the legislation has been carelessly phrased, and will be perverted if tested by nice rules.'"

It must be assumed that both parties to this contract, the State through its legislature, and the defendant through its officers, had knowledge of the opinion of the attorney general, procured by the State in 1852, that under the act of 1848 the defendant was not liable to be taxed for property outside the State; of the action of the auditor general in accordance with that opinion; that such property, both personal and real, would be taxed in the States where located; that neither such property nor the stock and bonds which produced it could be taxed in this State

without the consent or agreement of the defendant; that the Constitution of Michigan required equal taxation, and that consequently the taxing of the same property in two jurisdictions would be double taxation; that the original act provided for the taxation of property solely within the State, and that under the amendments the road thereby provided would extend through two other States.   Under these circumstances, is it reasonable to hold that the parties to the contract intended, the one to impose, and the other to assume, a heavy burden not mentioned or in any manner referred to in either the original or the amended act?   Can such an obligation be read into a contract by implication?   I think not.   The language of Mr. Sutherland in his work on Statutory Construction (§ 490) is applicable to this state of facts:

" Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice."

If by the amendment of 1855 the defendant had been authorized to purchase as an eastern connection the Grand Trunk Railway of Canada, or to construct a new road at an expense of $30,000,000 or $40,000,000, the entire property being situated in a foreign country, and subject to taxation there, could it reasonably be held that the parties agreed without any reference whatever to the subject that its stock and loans issued for that purpose should pay a tax to this State, because by the original contract it was required to pay a tax on its property in Michigan?   If such a purpose had been in the minds of the ₍parties, I think they certainly would have used language clearly indicating such a purpose.   If the framers of a constitution are presumed to have knowledge of existing laws (*People* v. *May*, 3 Mich. 598), and if constitutions are to be construed in the light of the public history of the time (*Bay City* v. *State Treasurer*, 23 Mich. 499), and surrounding circumstances (*Kennedy* v. *Gies*, 25 Mich. 83; *People* v. *Harding*, 53 Mich. 48, 481), we must hold that the legislature, in making and changing contracts, had knowl-

edge of the reports of its attorney general and auditor general upon the subject, and amended its contract with reference to that knowledge.   If, however, there were any doubt about the construction to be placed upon this amendment, and this at least must be conceded, the parties to the contract have by a uniform course of conduct for nearly 50 years given it a construction.   Where parties by such a uniform course of conduct for a long time have given a contract a particular construction, that construction will be adopted by the courts.

   " The practical interpretation given to contracts by the parties to them, while engaged in their performance and before any controversy has arisen concerning them, is one of the best indications of their true intent."   3 Current Law, p. 830.

   1 Current Law, p. 656; *Wilson* v. *Godkin*, 136 Mich. 106; 9 Cyc. p. 588; Clark on Contracts (2d Ed.), p. 407; 2 Page on Contracts, § 1126; *Topliff* v. *Topliff*, 122 U. S. 121, 131; *Leavitt* v. *Investment Co.*, 54 Fed. 439; *Staples* v. *Lumber Co.*, 56 Minn. 16; *Hill* v. *City of Duluth*, 57 Minn. 231; *Hosmer* v. *McDonald*, 80 Wis. 54.[1]

   There is, in my opinion, no escape from the conclusion that from 1855 until this suit was commenced, both parties, through their duly authorized officials and agents, so construed the amendment of 1855.   Both parties have rested upon this construction, and the defendant has made its investments under it, and now the attorneys for the State seek to set that construction aside and read into this amendment by implication a new burden the principal of which is now about $4,000,000, and the interest at least as much more, amounting to nearly half the capital stock of the company, as shown by the information.   It appears conclusively from the reports and records referred to above, that all the data for determining this question were before the proper agents and officials of the State.   Reverse the situation.   Suppose the State had insisted upon the con-

_____
[1] See Ad Eundem, post, 174.

struction it now places upon that amendment; suppose the defendant through its proper officer, its president, had obtained the opinion of its counsel that the tax was valid, and the defendant had acquiesced in this construction; could it after 40 or 50 years be heard to say, "The construction is wrong, and we are entitled to receive back from the State the money we have paid contrary to the terms of our agreement?" Or, suppose that the State, as one of the considerations for this purchase by the defendant, had agreed to pay it annually a certain per cent. upon its capital stock, the other conditions in the original and the amended contract being the same, and the State had paid only upon the stock and loans invested in the construction of the road in Michigan, and the State had made an annual report to the defendant, stating fully the basis of the annual payments, the agreement requiring the reports and payments to be made to some specified officer of the corporation, and the corporation had taken the advice of its attorney whether the State should pay for investments outside the State; would the defendant be heard, after 50 years of acquiescence, to assert a contrary construction? Most certainly not. The State as a contracting party must be content to have its acts judged by the same standard that is applicable to individuals. Judged by this standard, I think there is no doubt as to the construction of the amendment of 1855. It is suggested, however, that this point is not properly raised by the demurrer. It directly affects the questions of the statute of limitations and laches. It involves all or substantially all there is of complainant's claim. It goes to the whole cause of action. If complainant has any claim aside from this, I think it was its duty to set forth such claim and the facts at its command upon which it is based. If the facts had been set forth in the information, it is entirely clear that any action at law was barred, and that any action in equity to enforce the lien which existed 15 years before the bringing of the suit was also barred, and that there was no fraudulent concealment. Without

stating the allegations of the information, which would unnecessarily lengthen this opinion, it is sufficient to say that the clear inference to be drawn from them is that the chief if not the sole controversy arises over the failure to report the capital stock and loans used under the amendment of 1855 in constructing the road outside the State.

4. There is no allegation in the information that the proper officers of the State did not have knowledge of the facts above set forth, and of the action of the State authorities under the contract prior to the knowledge of the relator in this case, the then attorney general, who had been in office but a short time, or that such officers were not fully informed, and did not act upon such information. Assuming that the attorney general, the relator, was the proper party to be informed upon the subject, there is no allegation that former attorneys general were not fully informed. The only allegation upon the subject is:

"That the information herein set forth and contained has recently, and within six months prior to filing this information, come to the attention and knowledge of the relator."

The knowledge of the attorney general who in 1852 gave his opinion to the auditor general that the defendant was not liable for taxes upon stock and loans invested outside the State, was certainly as binding upon the State as was the ignorance of the attorney general, the relator in this case, on the subject 50 years later. Shall it be assumed that the distinguished lawyer, Hon. Jacob M. Howard, who was the attorney general from January 1, 1855, until 1860, was not aware of the opinion of his immediate predecessor, and of the basis upon which the defendant made its reports and upon which the taxes were based during his incumbency in office, and that if it had been his duty to commence proceedings he would not have done so? When a party is once possessed of knowledge through his agent he cannot afterwards become legally ignorant thereof because his subsequent agents did not

acquire such knowledge by notice or otherwise. Knowledge once acquired by a principal through his agents cannot afterwards lapse into legal ignorance. There is no allegation that the various executives of the State were not fully informed. On the contrary, as above shown, some of them were, and reported the facts in their messages to the legislature. Hon. John T. Rich was commissioner of railroads from 1887 to 1891, and afterwards for four years governor of the State. Is it to be presumed without allegation that he was not informed upon the subject? There is no allegation · that the secretary of State to whom these reports were first made, or that the auditor general, to whom they seem to have been transferred, were not informed of the basis upon which the taxes were paid. We hold, therefore, that the allegation of want of knowledge by the relator is not sufficient to raise a presumption of lack of knowledge on the part of the proper officers of the State, who evidently, as above shown, were cognizant of the facts.

5. The learned counsel for the relator also assert that the allegations of the bill or information must upon demurrer be taken as true, and therefore the allegations that the defendant during all these years did falsely, fraudulently, and deceptively conceal the real facts from the State, and did make false affidavits, are admitted. We think counsel are mistaken in the application of that rule. A demurrer admits the truth of the facts properly pleaded. It does not admit the truth of the conclusions which the pleader draws therefrom. There is no fact alleged upon which to base the charge of fraud, falsehood, and deceit, except the allegation of concealment. If the facts above referred to, which were evidently at the pleader's command, had been set forth in this information, if it had appeared that no charge was made of inaccuracies in the reports of stock and loans invested in the State, that the chief dispute was as to the liability for stock and loans invested outside the State, and that the reports from year to year showed this, and the pleader had then added the

allegation of fraud, etc., as above stated, a demurrer would have admitted the truth of the facts stated, but would not have admitted the conclusion of fraud and deceit drawn therefrom by the pleader. As we have shown, courts are entitled to consider those facts as if they were stated in the information. Under the contention of the relator upon this point, a demurrer would be absurd, for an admission of fraudulent concealment of the cause of action would admit that there was no bar to the statute of limitations as to an action at law, or a suit in equity to enforce a lien.

6. If I am correct in the construction of the contract as above stated, and also in holding that the construction given to it by the parties through their agents for so many years is conclusive, the staleness of the claim and the questions of laches and estoppel become unimportant. We said in *State* v. *Railroad Co.*, 89 Mich. 481: "That the State, as well as individuals, may be estopped by its acts, conduct, silence and acquiescence, is established by a line of well-adjudicated cases," citing authorities, and to which I will not here again refer. That case was cited with approval in *Michigan* v. *Railroad Co.*, 69 Fed. 116. Herman in his work on Estoppel and Res Judicata (section 1128) states the rule applicable to the State thus:

"A State in its contract with individuals must be judged, and must abide by the same rules which govern similar cases between individuals, and whenever such a contract comes before the courts the rights and obligations of the contracting parties will be adjudged upon the same principles as if both contracting parties were private persons."

In *United States* v. *Beebe*, 4 McCrary (U. S.), 12, the government sought to cancel and set aside certain land patents on the ground of fraud. Lapse of time was held a good defense, the court holding: ·

"When the government becomes a party to a suit in its courts it is bound by the same principles that govern individuals. When the United States voluntarily appears

in a court of justice it at the same time voluntarily submits to the law, and places itself upon an equality with other litigants."

See, also, *United States* v. *Stinson*, 125 Fed. 907.

Counsel for the relator insist that the estoppel in some if not all of the cases cited is based upon some positive official act of an officer of the State, and that estoppel cannot rest upon nonaction.   I do not understand that the authorities make this distinction.   The rule is that if a party fails to speak when he should have spoken, and the other party acts upon his silence or acquiescence to his prejudice, he will not be heard afterwards to speak. There is no logic in saying that under a contract the State is estopped by some positive official act of its duly authorized agent, and that it is not estopped by positive acquiescence of the same official with full knowledge of the facts before him.   The State with the necessary facts at its command and appearing in the reports made to it, by the defendant and by the officers of the State, stood by for nearly 40 years and acquiesced in the method of computing these taxes in accordance with the defendant's construction of the contract, during the entire time it was in force.   It rested 11 years longer before bringing action. When the State had full knowledge of defendant's claims and construction of the contract, it became its duty to act if it claimed a contrary construction.   Every report made to, and accepted by, the State, followed by a payment and acceptance of the money, became a settlement, and can only be set aside on the ground of fraud or mistake. Such a course of conduct on the part of the State would be most unjust and inequitable.   It would lead to financial ruin in many cases.   Few, either farmers, business men, or laborers could permit indebtedness to thus accumulate for 50 years without resultant ruin.   It is true that the entities of the parties to this suit are the same that they were 50 years ago.   But it is equally true that the real parties in interest are not the same.   The stockholders of defendant today are not the stockholders of from 11 to 50

years ago. It follows that if the contention of the relator be sustained the present stockholders who are presumed to have purchased the stock with knowledge of its resources and liabilities, must have their securities diminished by $8,000,000 which would have been borne by stockholders of former days.

This is not a case for the application of the doctrine invoked in behalf of the relator in *State, ex rel. Bain,* v. *Railroad Co.,* 52 Fed. 450. In that case the tax upon the stock of the company depended upon the amount of the income and the dividends paid, and could only be assessed after the company had made the proper report. It made no reports, and therefore laches could not be imputable to the State in failing to enforce it. Neither, in my judgment, does *Auditor General* v. *Railroad Co.,* 82 Mich. 426, apply. In that case there was no question of the statute of limitations raised, no contract to construe; no dispute as to the amount of the taxes, or that the lien had once attached to the property; neither was there any doubt as to the duty of the auditor general to proceed. The claim of the purchasers of the railroad property was that they were bona fide purchasers and that the lien was lost by the failure of the auditor general to proceed to collect the tax as soon as he might have done. The language there used is entirely appropriate to the facts, but is not appropriate to the facts of this case. On the contrary, the rule in *St. Paul, etc., R. Co.* v. *Sage,* 49 Fed. 315, applies to this case. It was there held under similar circumstances that evidence was almost certain to be lost by lapse of time; and that that alone was "sufficient reason for requiring diligence at the hands of a suitor in equity;" that the court could not ignore the fact that stock and bonds of corporations are constantly changing hands, and that the purchasers buy with reference to the property and resources of the corporation as they existed at the time of purchase. See, also, *Graham* v. *Railroad Co.,* 118 U. S. 161. It is probable, in fact quite apparent, that testimony in this case is lost. These

parties dealt through their agents, and if they were living their testimony as to what was done, negotiations that were had, the claim of the parties, and the action taken, thereon, would be competent and perhaps controlling in the absence of other record evidence. Furthermore, it is entirely possible that in the expenditure of money outside the jurisdiction of the State a different policy would have been pursued, or less money invested if the defendant had understood that the property so invested would be liable to taxation in this State as well as outside.

Suppose A. sells to B. certain property and business, to be carried on only within the State of Michigan, subject to a burden to be borne by B. and paid to A. B. desires to extend his business to other States. He obtains permission, and the contract is changed without any reference to the burden. In the other States, where the business is proposed to be carried on, the business is subject to similar burdens which B. assumed in this State. The question arises as to whether that burden follows the business and investments out of the State. A. takes advice from his counsel, and he is advised that it does not. B. makes his investments for 50 years upon the assumption that he owes A. no such burden. Can A. at the end of 50 years insist that the contract had been misconstrued, and that B. owes him the burden? If the rule of laches and estoppel, terms which are interchangeable, do not apply to such a case, it is difficult to conceive a case where it would apply. As to this claim, I think the State is clearly estopped on the ground of laches and staleness of the claim, even if it might have maintained its present contention at the beginning. I deem it due to the actors in this matter, during all those years, who cannot now speak for themselves, to say that it appears from the records they left as above set forth, that they were vigilant; that they undoubtedly acted in good faith, and upon the honest construction then placed upon this important contract.

I think the decree should be reversed, and the case remanded to the court below with permission to relator to

amend his bill if he has any claim outside of those above discussed, and that he should set out more particularly the reasons for the delay, and more specific grounds for charging fraud and deceit.

AD EUNDEM.   Since the above opinion was written, the supreme court of Illinois has decided a case which involves the construction of a clause in their constitution, claimed to forbid the payment of certain fees to certain public officers, and which has a direct bearing upon the construction to be placed upon the contract between the parties to this litigation.   In it the court say:

" But where the words of a constitutional provision admit of doubt, the court may and ought to consider a contemporaneous and practical construction given by the legislature and those concerned in the administration of the law, and also any injurious consequences which would follow a different construction.   Where a particular construction has been given to a provision and it has been continued for a long term of years and acquiesced in by the public at large, such construction is entitled to great weight and may be equal in force to a judicial construction.   *Bruce* v. *Schuyler*, 4 Gilm. (Ill.) 221; *Bunn* v. *People*, 45 Ill. 397; *Nye* v. *Foreman*, 215 Ill. 285; 8 Cyc. p. 736; Cooley on Constitutional Limitations (7th Ed.), p. 102; 26 Am. & Eng. Enc. Law (2d Ed.), p. 633." *County of Cook* v. *Healy*, 222 Ill. 317.