(12 Misc. Rep. 526.)

### In re BOARD OF STREET OPENING AND IMPROVEMENT.

### In re 136TH ST.

(Supreme Court, Special Term, New York County. May, 1895.)

1. MUNICIPAL CORPORATIONS—NEW YORK BOARD OF STREET OPENING—POWERS.
    Laws 1803, c. 70, designated in the preamble as an act to furnish a remedy for unsanitary conditions, among which was "narrow and confined streets," provided (section 10, incorporated into N. Y. Consolidation Act 1882, § 94) that no new street should be laid out, except with the permission of the common council, and that abutting property owners might be compelled to remove buildings adjoining streets opened in violation of the act. *Held*, that such act was designed to prohibit individuals from opening streets across their property as a matter of private enterprise, and does not restrict the exclusive power conferred by section 955 of the consolidation act on the board of street opening and improvement in the matter of laying out streets.

2. STATUTES—CONSTRUCTION BY EXECUTIVE OFFICERS—EFFECT.
    Where the proper interpretation to be given a statute is a matter of doubt, the practical construction which it has received from those charged with its execution will control.

At chambers. Application by the board of street opening and improvement relative to opening 136th street, between Amsterdam avenue and the Boulevard. Petitioner moves for the appointment of commissioners of estimate and assessment. Granted.

Francis M. Scott (Henry De Forest Baldwin, of counsel), for petitioner.

James A. Deering, for respondent.

BEEKMAN, J. This motion is made for the appointment of commissioners of estimate and assessment in the above-entitled proceeding. Upon the hearing of the motion, an objection was made on the part of a property owner affected thereby that the court was without jurisdiction, in that no action had been taken by the common council laying out said street. It is conceded that no such action has been taken. The counsel to the corporation contends, on behalf of the city, that no such sanction is required, but that exclusive jurisdiction in that regard is vested in the board of street opening and improvement. The learned counsel for the respondent, however, claims that the authority of the board of street opening and improvement is still subject to the action and approval of the common council, and that no new street can be laid out in the city of New York without the affirmative action of that body. In support of this claim, attention is called to section 94 of the New York City consolidation act of 1882. That section reads as follows:

"Sec. 94. No new street shall hereafter be laid out in the said city except with the approbation and permission of the mayor, aldermen and commonalty, in common council convened; and if any street shall be laid out without such permission, it shall be lawful for the said mayor, aldermen and commonalty, by by-law or ordinance, to direct the same to be stopped up, and all buildings adjoining thereto to be removed by the proprietors or occupants within such times and under such penalties as they shall think proper."

Section 955 of the consolidation act constitutes the board of street opening and improvement, and, as originally passed, vested that board with—

"All the powers and authority as to laying out, opening, widening, straightening, extending, altering and closing streets or avenues, or parts of streets or avenues, in that part of the city of New York south of Fifty-Ninth street, which on April 30th, 1873, were in any manner otherwise conferred and vested, or which relate to altering the map or plan of said city."

The board was further authorized and empowered, whenever it might deem it for the public interest so to do—

"After laying its proposed action before the board of aldermen, and publishing full notice of the same for ten days in the City Record, to alter the map or plan of New York City so as to lay out new streets in said part of said city, and from time to time to cause maps showing the several streets or avenues so laid out, opened, widened, straightened, extended, altered or closed by them to be certified by them and filed, one in the office of the department of public works of said city, and one in the office of the counsel to the corporation of said city."

And it was thereupon made the duty of the counsel to the corporation, on the filing of said maps in his office, and on a requisition therefor in writing, made by said board, to take proceedings immediately, in the name of the mayor, aldermen, and commonalty of the city, to acquire title to the lands so affected. In 1884, two years after the enactment of the consolidation act, section 955 was amended so as to authorize said board, "after laying its proposed action before the board of aldermen, and publishing full notice of the same for ten days in the City Record, to alter the map or plan of the city of New York so as to lay out new streets or avenues, and to widen, straighten, extend, alter and close existing streets or avenues in that part of the said city lying between Fifty-Ninth street and One Hundred and Fifty-Fifth street and south of the Harlem river," and providing similarly in reference to the filing of maps as before stated.

If section 94 of the consolidation act, above quoted, had been intended primarily to confer jurisdiction upon the common council in reference to the laying out of new streets, it would, perhaps, be difficult to satisfactorily answer the contention of the respondent that the section in question, and that which relates to the powers of the board of street opening and improvement, should be read together, so as to give effect, as far as possible, to both, and that under that rule of construction, while the board of street opening and improvement would still have the initiative in the laying out of streets, its action could not be effective without the approbation and permission of the common council. But the learned counsel for the respondent has, I think, misapprehended the meaning of section 94. That section is taken bodily from chapter 70 of the Laws of 1803, entitled "An act to invest the mayor, aldermen and commonalty of the city of New York with adequate powers in relation to certain objects of importance to the police and health of the said city," passed April 2, 1803. The act in question contains the following preamble:

"Whereas the general welfare of the state is connected with the safety and the health of the city of New York, which has been visited with destructive

and epidemic disease, the causes of which as far as human wisdom can discover ought to be removed, and such measures adopted as by Divine favor may prevent the return of that malady, and whereas it is represented to the legislature that noxious exhalations from sunken and damp lots of ground, deep, damp cellars, narrow and confined streets, foul and ill-constructed sinks and privies unfinished, water lots, foul slips, putrid or unsound provisions and other evils of a similar nature, together with the practice of interring the dead in the heat of summer in improper places and without due precautions, are among the causes to which the existence or malignity of that disease may be in a great measure attributed, therefore to remedy the said evils, be it enacted by the people of the state of New York, represented in senate and assembly," etc.

By section 20 of the said act it was provided that the same should be and continue in force for three years from the passing thereof, and no longer; but by chapter 126, Laws 1806, it was continued indefinitely.

It is thus made evident that the provisions of the law in question were intended to provide for an emergency, and to furnish a remedy for unsanitary conditions which had seriously affected the health of the community. Among the productive causes of ill health and disease enumerated in the preamble are "narrow and confined streets"; and, among the 23 sections of the act, severally dealing with the respective matters set forth in the preamble, we find the subject of streets dealt with in the tenth, eleventh, and fifteenth sections. Section 94 of the consolidation act is identical with section 10. It may fairly be inferred that the evil to which the remedy was intended to be applied was the practice on the part of property owners of laying out streets through their property according to their own caprice, and in a manner prejudicial to the public welfare. The section in question is prohibitive in form, and was intended, not to declare the existence of a new jurisdiction in the common council, or in the city authorities, but, as a matter of public concern, to prohibit the opening of new streets under purely private auspices, and to limit the exercise of any such right on the part of individual property owners to cases where the permission of the common council should first have been obtained. The section contains within itself evidence of the correctness of this view, in that it treats the abutting property owners as the offenders, and authorizes the common council to compel them to remove their buildings, under penalties for disobedience. Other evidence of the existence of this practice also appears in the authority conferred upon the commissioners appointed to lay out the city north of Astor Place, under chapter 115 of the Laws of 1807, to shut up any streets theretofore laid out, but not accepted by the common council; and in the report of the commissioners, which recounts their efforts to amalgamate their plans with those already adopted by property owners. Valentine's Laws, p. 809. In fact, it is difficult to come to any other conclusion, upon an examination of the act of 1803, and a consideration of the purposes for which that act was passed, so carefully recited in the preamble to the act.

Further confirmation, however, of this construction will be found when we come to consider other existing statutory provisions dealing primarily with the authority of the corporation over the subject of

streets and highways.   By the sixteenth section of the Montgomerie charter it was expressly provided that the common council of the city should have "full power, license and authority not only to establish, appoint, order and direct the making and laying out of all other streets, lanes, alleys, highways, water-courses and bridges not already made or laid out, but also the altering, amending and repairing of such streets, lanes, alleys, highways, watercourses and bridges heretofore made or laid out or hereafter to be made or laid out in and throughout the said city of New York and the Island of Manhattan, in such manner as the said common council for the time being or the major part of them shall think or judge to be necessary and convenient for all inhabitants and travelers there." In 1787 the power thus conferred underwent some modification by the passage of chapter 61 of the Laws of 1787, whereby it was enacted that "the mayor, aldermen and commonalty of the city of New York, in common council convened, and their successors shall be and hereby are appointed commissioners to regulate and keep in repair the present public roads or highways, and to lay out, regulate and keep in repair such other public roads or highways as shall hereafter be laid out in the said city and county," and this was the condition of the law at the time the act of 1803 was passed.   Considering these statutes together, it thus becomes quite plain that section 10 of the act of 1803 neither conferred, nor was intended to confer, any power upon the common council in reference to the laying out and the opening of streets and highways within the city, as such jurisdiction already inhered in that body, and had been possessed by it for more than a century before the act in question was passed. The section must, therefore, be construed, as has already been said, solely as a prohibition against any person or persons undertaking, as a matter of individual enterprise, to lay out streets without the permission of a public body, already possessed of authority to do so. The act in question thus became declaratory of an established policy, which has continued to the present time,—that the laying out and opening of streets in the city of New York was a matter of public concern, and, in the interests of the public health and convenience, should always be subject to regulation by public authority.   From this point of view, the provision in question would, therefore, always continue to be effective, and fully expressive of the intention with which it was enacted, wherever the public authority with reference to the laying out of streets might reside.   The substantive intent being the removal of the subject from the domain of private enterprise to that of public regulation, the statutory provision would still continue fully operative, and in full harmony with such intent, although the general power to lay out new streets might be taken from the common council, and vested in some other public authority. The substance of the statute is the prohibition.   The qualification of that prohibition is the permission and approbation of the public body having jurisdiction in the matter of laying out such streets. The prohibition was not directed against a public agency vested by legislative enactment with jurisdiction over the subject, as the common council itself was the only public body then vested with such

authority, but obviously against any undertaking on the part of private persons to do that which the statute declares the public interests require to be done only through public authority. The very words used, "permission" and "approbation," imply initiative on the part of others,—something in reference to which the permission and approbation of the common council must be sought. The construction thus given seems naturally to follow the application of the rule which requires a statute to be interpreted in the light of surrounding circumstances, and in furtherance of the object sought to be attained by the legislature through its agency.

Without attempting to go over the history of legislation on the subject of laying out streets in that portion of the city which includes 136th street, it is sufficient to say that, for years prior to the passage of the consolidation act, jurisdiction over the subject, either declared in express terms to be exclusive, or of that import, had been vested in other public authorities than the common council. The jurisdiction thus exclusively conferred could not reasonably be held to have been subject to the permission and approbation of the common council. The jurisdiction conferred upon the board of street opening and improvement, which has succeeded to the powers formerly exercised by these other public bodies, is very comprehensive, and apparently of the same exclusive character. The words which qualify the power and authority of the board to take action, expressed in the phrase, "whenever they may deem it for the public interest so to do," are pregnant with the purpose that to that body should be committed the absolute and unqualified power of determining upon that which, in their judgment, the public interest required, and that in that regard their discretion should not be subject to review. The statute declares that the board is authorized and empowered, whenever they may deem it for the public interest so to do, to alter the map or plan of the city of New York, etc., and while it also provides that such proposed action shall be laid before the board of aldermen, and full notice of the same shall be published for 10 days in the City Record, its power to proceed and alter the map of the city is unqualified by any requirement that the consent thereto of the board of aldermen should be obtained. The whole history of legislation upon this subject for many years past negatives the idea that any such consent was considered proper. We find sufficient reason for the requirement that proposed action should be communicated to the board of aldermen, and duly advertised, in the importance of notice, not only to individuals concerned in the proposed improvement, but also to the legislative body of the municipality itself, representing, in a sense, the body of the people, and therefore presumed to be interested in presenting to the board such considerations as, in their judgment, might seem fit, either in support of or in opposition to the proposed change. The provision is not sufficient to give a new meaning and object to section 94.

Another circumstance of great force in construing this section is found in the fact, shown by the affidavits before me, that, while the board of street opening and improvement has exercised the powers so conferred upon it in reference to the city south of 59th street

since 1871, and in reference to the portion of the city between 59th street and 155th street, and south of the Harlem river, since 1884, and has in each case published the above notice, and laid its proposed action before the common council, in no case has the common council passed any resolution or ordinance in relation thereto, or assumed to take any action thereon.  It is a well-recognized rule of statutory construction that a long-continued course of action by public officers under a statute is entitled to great weight with the court in construing it.  In the case of In re Washington St. A. & P. R. Co., 115 N. Y. 442, 22 N. E. 356, Peckham, J., says (page 447, 115 N. Y., and page 356, 22 N. E.):

"Such acquiescence and recognition on the part of the officers of the government are of very considerable, if not of controlling, weight in the interpretation of a general act of the legislature relating to public objects like the one under discussion.  Easton v. Pickersgill. 55 N. Y. 310;  People v. Dayton, Id. 367."

Streets have been laid out and opened under the direction of the board of street opening and improvement for many years past, and large sums of money have been expended by the city therefor.  If the construction contended for by the counsel for the respondent is correct, the consequences of proceeding without the consent of the common council in all these cases would prove to be most serious;  and, while this is not a sufficient reason for refusing to give to a statutory provision the meaning which it plainly calls for, it is sufficient, in matters of doubtful construction, to turn the scale in favor of the practical construction which the statute has received from those who are charged by law with its execution.  In the present case it cannot, at best, be claimed that the question under discussion is so plain as not to admit of discussion, and a case is therefore presented which justifies the application of the above rule, and the adoption of the practical construction which the public authorities in the city of New York have for so many years given to these statutes.  Motion granted.