ATTORNEY GENERAL, *ex rel.* RUGGLES, *v.* BUCKLEY & DOUGLAS LUMBER CO.

CORPORATIONS — QUO WARRANTO — ULTRA VIRES ACTS — MINING COMPANIES—SALT MANUFACTURE—VALIDITY OF INCORPORATION —ESTOPPEL OF STATE.

> After permitting a lumber company, organized as a manufacturing corporation under 2 Comp. Laws, § 7037 *et seq.*, and numerous other lumber companies, to produce salt in connection with lumbering operations for upwards of fifteen years, to the knowledge of various State officials who made frequent reports of the facts and after legislating with reference to such industry, the State, by its conduct, has construed the statute to include and authorize the production of salt as a manufacture, and cannot by quo warranto proceedings question the right of such corporation to carry on such business.

Error to Manistee; Withey, J. Submitted January 9, 1911. ( Docket No. 51.) Decided March 13, 1911.

Information in the nature of quo warranto by John E. Bird, attorney general, on the relation of Charles F. Ruggles, against the Buckley & Douglas Lumber Company. A judgment for respondent on a verdict directed by the court is reviewed by relator on writ of error. Affirmed.

*Charles McPherson* (*Franz C. Kuhn*, Attorney General, of counsel), for appellant.

*Kleinhans & Knappen* and *Wilson, Wilson & Rice* (*Humphrey, Grant & Baker*, of counsel), for appellee.

MOORE, J.   The respondent corporation was organized in January, 1893, under Act No. 232, Pub. Acts 1885 (2 Comp. Laws, § 7037 *et seq.*).   Its purposes as expressed in its articles are:

"The purchase and sale of lands and timber; the manufacture, purchase, and sale of timber and lumber, and transacting a general manufacturing and lumber business and everything belonging thereto or connected therewith."

Ever since its organization it has operated a sawmill at Manistee, and been engaged in the manufacture of lumber.   In 1895 it erected a salt block, and engaged in the manufacture of salt in connection with the operation of its sawmill, and from that time on has been producing salt.   Its investment in the salt plant is approximately $160,000, and its investment in the lumber business outside of the salt business is approximately $1,400,000.

It is the claim of relator that the respondent has no authority to manufacture salt, for the reason that the production and manufacture of salt, as carried on by respondent, is a mining business, and not a manufacturing business, and that a corporation cannot be organized for or conduct a mining business under Act No. 232, Pub. Acts 1885, but should be organized under Act No. 113, Pub. Acts 1877 (2 Comp. Laws, § 6991 *et seq.*).   The attorney general, on the relation of Charles F. Ruggles, filed an information in the nature of quo warranto, by which the court was informed that the respondent was incorporated under Act No. 232, Pub. Acts 1885, and had been and was at the time of filing the information exercising a franchise or privilege not conferred upon it by law, and asking for a judgment of ouster.   The trial judge ruled that a corporation incorporated under Act No. 232, Pub. Acts

1885, and existing under Act No. 232, Pub. Acts 1903, could not lawfully engage in the manufacture of salt, but held that the State, because of the knowledge and acquiescence of the secretary of State and State salt inspector, was estopped to deny respondent's right to manufacture salt, and was estopped to enforce the law against respondent, and upon that ground he directed a verdict for the respondent.

The contention of relator as stated in the brief of counsel is as follows:

" As there is no disputed fact in the case, we contend not only that the judgment below should be reversed, but that judgment of ouster should be entered in this court. We contend that:

" (1) The franchise or privilege of producing and selling salt in the manner shown by the information, and admitted by the plea, has never been conferred upon respondent.

" (2) The State is not estopped by the knowledge and acquiescence of its executive officers from imposing upon respondent the penalties provided by statute for the punishment of a corporation which exercises a franchise or privilege not conferred upon it by law, and diverts its funds to a purpose not specified in its articles of association.

" (3) The knowledge and acquiescence of the private relator and his motive in requesting the attorney general to file the information are immaterial, and constitute no defense to the information.

" (4) Judgment should be rendered that respondent be dissolved."

It is the contention of respondent ( we quote from the brief )—

That it has a lawful right and authority to engage in and carry on the business of manufacturing salt as it is now organized, for the following reasons:

(1) The production of salt, as carried on by respondent and by other producers of salt in the State of Michigan, is a general manufacturing business, and not a mining business.

(2) The legislature of this State have recognized the

business of producing salt in this State, as carried on by respondent, as a general manufacturing business, and not a mining business, and have legislated with reference to it as such.

(3) That the relator, through its executive officers, whose duty it is to execute the laws, has by a practical interpretation of said Act No. 232, Pub. Acts 1885, and said Act No. 232, Pub. Acts 1903, ever since their passage, permitted corporations to be organized for the purpose of engaging in the production and manufacture of salt, and permitted them, including respondent, to conduct and carry on the business under those laws, and such acquiescence now binds relator.

(4) Relator is now estopped by its conduct from denying that respondent, as now organized, has a right to carry on the business of manufacturing salt.

At the trial relator submitted the case upon the admissions made in respondent's plea. Respondent offered in evidence certified copies of the articles of association of 14 corporations, of which the following two are examples:

(1) Saginaw Lumber & Salt Company, incorporated in 1882, for the purpose of—

" Carrying on and conducting the business of cutting, hauling, driving and running logs and manufacturing the same into lumber and shingles, and into lath, and also for the purpose of manufacturing salt and salt barrels in connection with said manufacture of lumber, and also buying and selling lands, lumber, and salt, and doing a general lumber and salt business."

(2) Louis Sands Salt & Lumber Company, of Manistee, incorporated in 1905 under Act No. 232, Pub. Acts 1903, to—

"Conduct and carry on a general timber and salt manufacturing business, including logging operations, manufacturing, buying and selling salt, lumber, shingles, lath, staves, heading, ties, posts, tanbark, wood and other forest products; also the buying and selling of logs, timber, coal and general merchandise, and for the purposes of said business to build, purchase, equip, maintain, own and operate sawmills, shingle mills, stave mills, salt blocks, lumber yards, docks, shops, stores, warehouses, steam and tram logging roads, vessels and water craft

and such other structures, equipment and appliances as may be necessary or convenient in the conduct of said business."

The others were of like purport. The last one was: Mershon-Bacon Company, incorporated in 1906, under Act No. 232, Pub. Acts 1903, to—

"Manufacture lumber and salt and to manufacture lumber and forest products into various commodities, and to buy, sell and deal in salt, lumber and forest products and various commodities produced therefrom."

Respondent also offered in evidence a printed copy of a pamphlet compiled by S. S. Garigues, State salt inspector, and printed by a legislative committee on lumber and salt in 1881. Respondent also offered in evidence printed copies of the annual reports of the State salt inspector for the years 1893 to 1909, inclusive. In the report of the State salt inspector for 1896, it is stated that

"Buckley & Douglas, Manistee, have built a very large plant this season, consisting of both grainer and vacuum pan process, estimated capacity of 2,000 barrels per day."

In the reports for 1897, 1898, 1899, and 1900 Buckley & Douglas are shown as manufacturers of salt at Manistee; and in all subsequent reports the Buckley & Douglas Lumber Company is so reported. The report for 1909 shows the following salt manufacturers in Michigan for that year: District No. 1, Saginaw county, nine firms or corporations. District No. 2, Bay county, four corporations. District No. 3, St. Clair county, seven corporations. District No. 4, Manistee county, Buckley & Douglas Lumber Company and four other manufacturers. District No. 5, Mason county, three manufacturers. District No. 6, Wayne county, eight corporations.

Respondent also offered in evidence certified copies of its annual reports to the secretary of State for the years 1899 to 1909. In each of these reports respondent stated that it was engaged in the manufacture of lumber and salt and dealing in merchandise, and in the reports for the

years 1899, 1900, 1901, and 1902 it replied to the question, "Has the corporation during said period been engaged in any line of business not specified in its articles of association? If so, what?" by the answer, "Manufacturing salt." Thomas J. Elton, respondent's secretary, testified that he came to Manistee in 1882, and that the only salt that had been manufactured at Manistee had been manufactured in connection with the sawmills. Patrick Noud, a witness for respondent, testified that the first boring for salt at Manistee was done in 1878, and that since then salt has been manufactured continuously at Manistee. He had been connected with the State Lumber Company, which ceased operating shortly before the trial. That company had decided from experiments made by it that it could not manufacture salt profitably with coal as fuel.

Attention has been called to the following statutes as throwing some light upon the question: Act No. 41, Laws 1853 (1 How. Stat. § 4001 *et seq.*), which is a general mining and manufacturing act; Act No. 42, Laws 1867 (1 How. Stat. §§ 4026–4028), which authorizes associations or combinations of those engaged in the manufacture of salt; Act No. 187, Pub. Acts 1875, which is a general manufacturing act; Act No. 113, Pub. Acts 1877, which is a general mining company act, under which act relator says respondent must organize before it can manufacture salt. Section 1, Act No. 113, Pub. Acts 1877, reads:

"That it shall be lawful for any number of persons, not less than three, by articles of agreement in writing, to organize themselves into a corporation for the purpose of engaging in and carrying on any kind of mining business, or for refining, smelting or manufacturing any and all kinds of ores, minerals or metals, or for both mining, refining, smelting and manufacturing any or all such ores, minerals or metals."

If salt is referred to in this section, it is embraced in the word "minerals." Act No. 232, Pub. Acts 1885, is a general manufacturing act, under which respondent

organized.    Act No. 232, Pub.  Acts 1903, is a general manufacturing company act.

Counsel also call attention to some of the history of salt production in the State, as follows:

"By act of March 24, 1838, the State geologist was directed to commence boring for salt as soon as practicable at one or more of the salt springs, employing assistants 'well skilled in the practice of salt boring,' and the sum of $3,000 was appropriated to defray the expenses, to be paid out of the internal improvement fund, and required the State geologist to make report at the next regular session of the legislature.   This report was made January 1, 1839, and in that report to the legislature, the State geologist uses this language:

" 'In order to procure water of sufficient strength and purity, it has been found indispensable to penetrate the overlying rocks as well as a portion of the rock from which the salt water flows.   The depth to which it has been found necessary to sink varies from 350 to 1,000 feet, the deep boring for the most part furnishing water of a strength superior to the more superficial ones.'

"This report of the geologist was referred in the senate 'to the committee of manufactories.'   In the report of this committee to the senate they suggested that the reference to them of this subject indicated that the senate fully anticipates 'the manufacture of salt and its transportation to its destined market.'   On January 28, 1839, the legislature passed an act appropriating the sum of $15,000 and directing the State geologist to continue the improvement. On March 30, 1840, the legislature made a further appropriation of $5,000 'for the improvements at the salt springs on Grand river, and $5,000 for those at the Tittabawassee river.'   Under this act, contracts were made by the State geologist with Lucius Lyon to sink the well on Grand river to a depth of 300 feet from the surface, and with Ira D. Farrand to sink the well at the Tittabawassee river to a depth of 300 feet from the surface, and these contracts were submitted to the legislature by Governor Woodbridge, with a special message, January 9, 1841. In the annual message to the legislature of Governor Barry, January 4, 1842, he calls attention to the fact that the attempt to obtain 'water possessing qualities suitable for making salt,' has thus far proved unsuccessful.   The legislature on February 14, 1842, appropriated $15,000 to

be expended upon the two wells already commenced. By act of February 16, 1842, the governor was authorized to cause the salt spring lands of the State to be platted into lots, and to lease the right ' to manufacture salt,' providing that every lease should contain a clause requiring at least 14 cents per bushel of 56 pounds to be paid to the State ' for the water.' By Act 200 of the Laws of 1859, the legislature offered a bounty of 10 cents per bushel on all salt produced, and, as they stated in the act, it is for the purpose of inducing the people of this State to engage in the business of ' boring for and manufacturing salt.' This act was followed by Act 186 of the Laws of 1861, which amends and continues this bounty ' for manufacturing salt.' Act 42 of 1867 speaks of the business as a manufacturing business. * * * Act 132 of 1897 * * * provides that ' whenever any well shall have been put down for the purpose of exploring for or producing salt or brine, upon the abandoning or ceasing to operate the same, the owner or operator,' etc., shall fill up and plug the well."

Counsel calls attention to the provisions of section 32 of Act No. 113, Pub. Acts 1877. This section provides for corporations organized under the act making an annual report to the State, and specifies what that report shall include, among others the following:

" (8) The number of gross tons of copper obtained. (9) The number of gross tons of 2,240 pounds each of iron ore mined and shipped. (10) The number of gross tons of mineral coal mined. (11) The number of gross tons of pig iron manufactured. (12) The number of tons of any other mineral or ore mined. (13) The amount of slate or stone mined."

And counsel contend that no mention of reporting the amount of salt produced is contained in that provision, although the manufacture of salt in the State of Michigan was considerable, and argue that it is reasonable to presume that, if the legislature intended the act should apply to salt manufacturing corporations, it would have specifically required a report of salt as well as of copper, iron ore, mineral coal, pig iron, slate, and stone. Attention is also called to Act No. 9, Pub. Acts of 1877 (2 Comp.

Laws, § 4630), where provision is made for the appointment by the governor of a commissioner of mineral statistics, and where his duties are determined, and by section 4634 he has a right to demand of a corporation or individual engaged in mining to make reports under oath as to their production and other matters required by him, and blanks are to be furnished to him for that purpose. By section 4635, the commissioner of mines is required to report to the auditor general on or before the 1st day of May in each year the amount of copper, iron, coal, or other mineral produced by each and every corporation or individual engaged in mining in this State during the preceding calendar year, which reports shall be the basis for computing the specific tax chargeable against such corporation or individual on the amount of mineral produced by them, etc.

It is argued that it is a significant fact that no provision was then made for obtaining a report from those corporations engaged in the manufacture of salt in Michigan by such commissioner.    Attention is also called to Act No. 29, Laws 1869 (2 Comp. Laws, §§ 4911–4953), "An act to regulate the manufacture and provide for the inspection of salt."    Section 1 of that act contains the following provision :

"That no salt manufactured in this State after this act takes effect, etc.    *    *    *    In case any manufacturer of salt shall knowingly sell or transport or permit to be sold or exported, salt contrary to the provisions of this act," etc.

Section 5 of that act, among other things, contains this clause:

"In case any person, firm, company or corporation shall neglect or refuse to pay such inspection fees on demand at his, their or its office or manufactory, the party so refusing shall be liable to an action therefor,    *    *    * and it shall be lawful for the inspector and his deputies to refuse to inspect salt manufactured at the works so in default until the amount due is paid.    *    *    *    The inspector shall keep just and true accounts of all money received under this section, and an account of the amounts re-

ceived from or paid by each person, firm or corporation engaged in the manufacture of salt," etc.

In 1905, by Act No. 323, these sections were amended so that the foregoing clauses thereof read as follows, viz. :

"That no salt manufactured or mined in this State after this act takes effect shall be sold within or exported from this State. * * * In case any manufacturer or producer of salt shall knowingly sell or export or permit to be sold or exported, salt," etc.

The forgoing clauses of section 5 are as follows:

"In case any person, firm, company or corporation shall neglect or refuse to pay such inspection fees on demand at his, their, or its office, manufactory or mine, the party so refusing shall be liable in an action therefor, * * * and it shall be lawful for the inspector and his deputy to refuse to inspect salt manufactured at the works, manufactory or mine so in default until the amount due is paid. * * * The inspector shall keep just and true accounts of all money received under this section, and an account of the amounts received from or paid by each person, firm or corporation engaged in the production of salt. * * *"

It is said this is the first place in the statutes where the mining of salt is mentioned or referred to in specific terms, and that the reason for this amendment is made clear by reference to the report of the State salt inspector for the year 1906 in which the following appears:

"The Detroit Salt Mining & Manufacturing Company are constructing a mine from which they expect to mine salt in about a year. They are down 360 feet, and making 50 feet a month. They expect to mine salt at a depth of 900 feet."

Nowhere does he refer to salt mining or to a salt mine except in the paragraph above quoted. This shows that a new method of producing salt was being inaugurated in this State, namely, that of mining it. The company referred to was sinking a shaft for the purpose of reaching the bed of rock salt which they proposed to mine by the

same means and in the same manner as other minerals and ores are usually mined.

Counsel also call attention to Act No. 404, Local Acts 1901, as showing that the legislature of the State of Michigan does not regard the manufacture of salt as a mining business ( the first section of this act reads: "All corporations organized under the laws of this State for the purpose of owning and operating street railroads in the county of Saginaw by electric motive power are hereby authorized and empowered to sell, dispose of or utilize their surplus or waste steam in the manufacture of salt," etc.), and argue that this law shows it was the intention of the legislature that salt might be manufactured by the utilization of surplus or waste steam.

Attention is called to the fact that the secretary of State, whose legal adviser is the attorney general, approved the articles of incorporation, not only of the respondent, but also of all the corporations before mentioned, many of which stated the purposes of the corporation were for the conduct of a general manufacturing business, and "also for the purpose of manufacturing salt and salt barrels in connection with said manufacture of lumber, and also buying and selling lands, lumber, and salt, and doing a general lumber and salt business."

We have not referred to all that is shown by the record and the references therein, but we think they establish the following propositions made by counsel:

"(1) The State of Michigan has in every way encouraged the manufacture of salt since its first discovery in the State.   It never was made successfully until the lumber mills took it up, using their refuse to evaporate the brine.

"(2) Corporations have been organized throughout the State to make salt in connection with manufacturing lumber.   The most of them organized under the manufacturing act of 1885.   All of them thought they had the right to make salt, and the State, through its various administrative officers, believed the same thing.

"(3) Every one during all these years has acted on the theory that these companies were legally organized, and were legally making salt.

"(4) The respondent has reported every year to the State that it was making salt.

"(5) The State salt inspector, when respondent started to build its salt block, reported the facts to the State that respondent was investing large sums of money to manufacture this product, that was beneficial to the people at large. The State knew that it was doing this, claiming the right to do it under its charter.

"(6) The legislature through the report of its committee knew that it was common for corporations organized to make lumber to also manufacture salt; that lumber companies all over the State where brine was found were exercising this right. From this report and the annual reports of the State salt inspector, the State knew that the only economical and practical way to make salt was in connection with the sawing of lumber.

"(7) The State, by its salt inspectors, has inspected and put its stamp of approval on every barrel of salt that respondent has ever made, and collected from respondent a tax for doing so.

"(8) Not only respondent but many other companies in the State organized under manufacturing company acts are making salt. They have invested millions of dollars in the enterprise with the knowledge and approval of the State."

We get back then to the question: Is the pumping of brine, running it into vats, and evaporating the water by the use of exhaust steam, and, when the mill is not running, by live steam made by burning fuel which otherwise would be useless waste, the manufacture of a food product, to be governed by the manufacturers' act, or is it a mining operation resulting in the production of a mineral within the meaning of the mining law of the State? The fact that counsel as able and learned as those engaged in this controversy differ as to which of these acts should control, indicates that the construction of the two statutes bearing upon this controversy is not entirely clear and free from doubt. The construction of a statute was before the court in *People* v. *Railroad Co.*, 145 Mich.

140 (108 N. W. 772). In the opinion by Justice Mont-
gomery, the following language is used:

"For the purpose of aiding in the construction of the
statute, the court may revert to the history of the times,
and ascertain, by such records as courts are authorized
generally to take judicial notice of, what construction has
been adopted by other departments of government. It
appears from these that to the knowledge of the executive
department, of the legislative and legal departments of
the State, and with the full approval of the latter, the de-
fendant has for over a century or more reported for taxa-
tion only such capital and loans as were employed in con-
structing a railroad within the State.   *   *   *
"We are of the opinion that the practical construction
of the executive and legislative branches of government
so long continued should be held decisive of the legislative
intent, and upon this question assent to the reasoning of
Mr. Justice Grant."

In the opinion of Mr. Justice Grant he uses this lan-
guage:

"If, however, there were any doubt about the con-
struction to be placed upon this amendment, and this at
least must be conceded, the parties to the contract have,
by a uniform course of conduct for nearly fifty years,
given it a construction. Where parties by such a uni-
form course of conduct for a long time have given a con-
tract a particular construction, that construction will be
adopted by the courts."

To the same effect are the following authorities: Cool-
ey's Constitutional Limitations (6th Ed.), pp. 83, 84;
*United States* v. *Finnell,* 185 U. S. 236 (22 Sup. Ct. 633);
*United States* v. *Johnston,* 124 U. S. 236 (8 Sup. Ct.
446); *Union Ins. Co.* v. *Hoge,* 21 How. (U. S.) 35;
*Scanlan* v. *Childs,* 33 Wis. 663; *Board of Com'rs of
Franklin Co* v. *Bunting,* 111 Ind. 143 (12 N. E. 151);
*State* v. *Kelsey,* 44 N. J. Law, 1; *Board of Street Open-
ing Case,* 12 Misc. Rep. 526 (33 N. Y. Supp. 594); *At-
torney General* v *Bank of Newbern,* 21 N. C 216;
*Commonwealth* v. *Mann,* 168 Pa. 290 (31 Atl. 1003);
*Harrington* v. *Smith,* 28 Wis. 43; *Westbrook* v. *Miller,*

56 Mich. 148 (22 N. W. 256); *City of Detroit* v. *Chapin*, 108 Mich. 136, 142 (66 N. W. 587, 37 L. R. A. 391); *City of Muskegon* v. *County of Muskegon*, 123 Mich. 272 (82 N. W. 131); *Attorney General* v. *Glaser*, 102 Mich. 409 (61 N. W. 648).

Applying these principles of law to the case before us, we think it clear the judgment of the court ought not to be disturbed. Having reached this conclusion, it is unnecessary to discuss the other questions raised by the record.

Judgment is affirmed.

MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.