RUGGLES *v.* BUCKLEY & DOUGLAS LUMBER CO.

1. CORPORATIONS—POWERS—CONTRACTS—ULTRA VIRES.

Where, by a former opinion (164 Mich. 625) it was determined that defendant lumber company had the right to manufacture salt, even to the extent of purchasing coal to supplement its waste wood product as fuel, and it appears from the record that defendant has sufficient timber to operate its mill during the lifetime of its charter, a contract for the installation of new evaporating pans, and a new system of applying the steam thereto, *held,* not *ultra vires,* even if an unwise act.

2. SAME—RIGHTS OF MINORITY STOCKHOLDERS.

Where it appears that unless something unforeseen occurs the expenditures under the contract will be met by the proceeds of the increased production of salt, it cannot be said that the making of said contract was a legal fraud upon the rights of plaintiffs, minority stockholders, and where the directors acted in good faith, the performance of said contract will not be restrained.

3. SAME—RIGHT TO WIND UP BUSINESS AFTER EXPIRATION OF CHARTER.

Under 3 Comp. Laws 1915, § 11335, a corporation may continue as a body corporate for the term of three years after the expiration of its charter, for the purpose of winding up its affairs, thus enabling it to continue its general business for its full charter period.

Appeal from Manistee; Cutler (Hal L.), J. Submitted January 13, 1920. (Docket No. 64.) Decided April 10, 1920. Rehearing denied June 17, 1920

Bill by Charles F. Ruggles and another against the Buckley & Douglas Lumber Company, the Manistee Iron Works Company and others to enjoin the performance of an alleged *ultra vires* contract. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*Musgrave, Oppenheim & Lee, Charles N. Belcher,* and *Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long,* of counsel), for plaintiffs.

*Thomas Smurthwaite,* for defendant Manistee Iron Works Company.

*Travis, Merrick, Warner & Johnson,* for other defendants.

SHARPE, J.   The plaintiff Ruggles is the owner of three-eighths of the stock of the defendant company, less one share held by Mr. Rademaker.   The defendant Buckley owns the remaining five-eighths, less one share held by each of the other defendants.   The corporation has been engaged in the business of manufacturing lumber since 1893, and since 1896 has manufactured salt in connection therewith.   The relationship of Mr. Ruggles and Mr. Buckley has not been friendly for many years.   They were copartners in the lumber business at the time the corporation was organized.

In 1910, the attorney general of this State, on the relation of Mr. Ruggles, filed an information in the nature of a *quo warranto* in the circuit court for the county of Manistee against the defendant corporation, seeking to forfeit its charter for the reason that it was unlawfully engaged in the manufacture of salt thereunder.   That case reached this court (*Attorney General, ex rel. Ruggles,* v. *Lumber Co.,* 164 Mich. 625), where the judgment of the circuit court in favor of defendant was affirmed.   A reference to this case will disclose the conditions which led the company to engage in the manufacture of salt and the claims then made relative thereto.

After that decision, the corporation continued the manufacture of salt, very profitable returns resulting therefrom.   A considerable amount of coal was used for fuel from the first in addition to the waste wood

product consumed. This has increased as the salt business was extended, and to a greater extent of late years as the quantity of logs sawed has diminished. A second salt block was purchased in 1910, but with this we are not concerned. In plant No. 1, the amounts paid for coal for fuel were: in 1897, $6,806; in 1910, $46,897; in 1915, $45,435; in 1917, $86,468, and in 1918, $153,575. The value of the salt block and equipment in 1910 was about $225,000, and in 1918 about $350,000.

The plaintiffs, both of whom were directors of the corporation, were notified that a meeting of the board would be held on September 10, 1918, to consider the execution of a contract with the defendant Manistee Iron Works Company for the installation in plant No. 1 of new pans and a new system of applying the steam thereto, whereby it was claimed that the same quantity of salt could be produced by the use of one-fourth the amount of fuel. The plaintiffs attended this meeting, all of the members of the board being present. A resolution was adopted, against the objection and vote of plaintiffs, directing that the contract should be entered into. The purchase price of the new equipment was $238,650 and, together with the expenditures necessary to be made by the company in its installation, would make the total cost thereof about $300,000.

The plaintiffs, on the day following, served a written protest on both of the defendant companies, insisting that it was unlawful for the lumber company to enter into such a contract, and on September 14th served an additional notice, setting forth at greater length the reasons for their complaint. The contract had, however, been executed by both companies on the 10th and the down payment of $23,000 made as therein provided for.

On September 27, 1918, plaintiffs filed the bill of

complaint herein, praying that the contract be declared *ultra vires* and void and that all of the defendants be restrained from doing any act in the performance of the same. They also ask that the individual defendants be held personally liable for any sums paid thereunder and for any loss the corporation may sustain by reason of its execution. No temporary injunction was asked for or granted. The proofs were taken in open court. The trial judge made exhaustive findings. It appeared that the Iron Works Company was then engaged in performing the contract and that the equipment would be fully installed on the date agreed upon therefor, June, 1920. He made a decree dismissing plaintiffs' bill, and they appeal.

The questions presented by counsel for appellants may, we think, be fairly considered under the headings following:

(1) Had the board of directors of the defendant corporation, under its charter, the power to enter into the contract with the Iron Works Company?

(2) If they had such power, was the making of such contract a legal fraud upon the rights of the plaintiffs as minority stockholders?

1. Counsel differ as to the effect of the decision in the *quo warranto* case. It is, however, conceded by plaintiffs that under that decision the lumber company had a right to engage in the manufacture of salt as an incident to the business of manufacturing lumber. In their brief, they say:

"The Buckley & Douglas Lumber Company had the incidental power to erect its salt block to consume a waste product arising in its lumber business under the facts existing and which were presented to this court in the *quo warranto* proceedings on the former hearing."

As the salt business was carried on at the time the proofs were taken in that case, in 1910, the lumber

company was using a considerable quantity of coal as well as the waste wood product in the evaporation of the brine. The amount paid for coal in that year in plant No. 1 was $46,897. We do not find that the cost per ton for that year is mentioned in the record, but we may take judicial notice that such an amount would have purchased a large number of tons. We may therefore assume that the use of coal in addition to the waste wood product for fuel is permissible under the incidental power to manufacture salt. Counsel further say:

"When the incidental power of the Buckley & Douglas Lumber Company to manufacture salt ceased, its right to continue that industry ceased, and it could not change the primary purpose for which it was organized in order to maintain a good will which it may have theretofore secured in the salt business."

The question then would seem to resolve itself into one of fact: Has such incidental power ceased by reason of the exhaustion of the company's supply of forest products? There is an abundance of proof that substantially all the other sawmills in the vicinity of Manistee have discontinued both the lumber and salt business for the reason stated. Counsel urge that the purpose of entering into this contract was not to provide a means of using profitably its waste wood product, but to engage in the business of manufacturing salt by the use of coal alone as fuel. We have carefully read the record and are satisfied that the lumber company had at the time the contract was entered into a sufficient quantity of timber to operate its mill at least during its lifetime under its charter. We find no little difficulty, in the determination of this question of fact, in distinguishing between the evidence affecting the power of the company to contract and that bearing on the propriety or wisdom of entering into such a contract. The latter has, of course, no

bearing on the former.  We cannot but find, under the
proofs, that the pans used in the evaporation of the
brine were fast becoming unfit for use.  A number
of expert witnesses so testified, one of them, Mr. Pow-
ell, saying:

"The pans are now 23 years old and judged by their
interior condition, I think, they have lived their full
useful life.  It will be good luck if they last any length
of time further."

If the company had sufficient timber to justify the
repair of the apparatus used in manufacturing salt and
in replacing the wornout pans, and had authority so
to do, the making of the contract for a new system
was but an exercise of the same power and, though it
may have been an improper or unwise act, yet, if not
unwarranted, it would not be *ultra vires*.  The board
had a right to take such action as would prevent the
loss of their waste wood product.  They had an op-
portunity to enter into a contract for the installation
of a plant, in the operation of which four times the
amount of salt could be produced by the use of the
quantity of fuel they were then consuming.  It was
not an experiment, as the record shows many such
plants were then in successful operation.  They were
fully protected by a guaranty and the right to test
the apparatus for 120 hours before acceptance.  The
record shows that the value of the waste product and
the coal used for fuel during the five years preceding
1918 had been relatively equal.  It also shows that
with the new equipment they will be able to manu-
facture as much salt as they were then producing by
the use of the same amount of waste product alone.
Had they concluded to make repairs on the old plant,
we apprehend that no question of power would have
been raised.  The right to replace wornout apparatus
would follow the right to repair.  The question seems
to us rather one of judgment as to what it was best

to do than one of the exercise of power under the charter.

Under the contract, the company will manufacture salt by the use of fuel, partly the waste product of the mill and partly coal, as it always has done. While the amounts paid for coal as fuel in 1917 and 1918 were much in excess of those paid in previous years, we find that this was largely due to the advance in the price of that commodity. As such manner of operation in the past has been within its corporate powers, we fail to see how operation under the contract can be said to be a usurpation of authority. The conclusion thus reached renders it unnecessary for us to consider the question of the express power of the company, or the estoppel of plaintiffs to complain, or the claim of defendants that its powers under its charter can only be attacked in a direct proceeding therefor, all of which are discussed at length by counsel.

2. Was the making of such contract a legal fraud upon the rights of the plaintiffs as minority stockholders? It is earnestly insisted by plaintiffs that, as the company's charter will expire in 1923 and cannot be renewed without the assent of the plaintiffs, who own more than one-third of the capital stock, the consummation of this contract, involving a very large expenditure, against their protest, amounts to a legal fraud upon their rights as stockholders. While conceding that management of its corporate affairs is committed to its board of directors, it is contended that, when its life under its charter is about to expire, the creation of so large a liability should be enjoined by a court of equity.

The facts heretofore stated and otherwise appearing in the record support the conclusion of the trial judge that the board of directors acted in good faith, and in what the majority of its members believed to

be the best interests of the corporation. No objection was raised by the plaintiffs to the making of the contract for the reason that it would not be profitable. The board had the same right as a copartnership or an individual would have to enter into any contract reasonably adapted to further the business of the corporation, if within the powers conferred under its charter. They may generally do whatever an individual, acting intelligently and honestly, would do under similar circumstances. Plant No. 1 then consisted of different structures, including a warehouse with a capacity of from 350,000 to 400,000 barrels, five salt wells about 2,000 feet deep, railroad tracks, docks and shipping facilities, besides the apparatus for the manufacture of the salt. Its total cost to the company had been about $350,000. We think the board was justified in preserving this investment, and the way to do so, in their judgment, was to install the new equipment provided for in the contract. Unless something unforeseen should occur, the expenditure under this contract will be met by the proceeds of the increased production of salt during the life of the corporation. At its expiration by limitation of law, the company will have a prosperous business in full operation to be disposed of in winding up its affairs.

The board was under no obligation to anticipate the expiration of its corporate existence by making preparations for its dissolution. Under the statute (3 Comp. Laws 1915, § 11335), it may continue as a body corporate for the term of three years thereafter, during which time its affairs must be settled. The purpose of this section was well stated in *Bewick* v. *Improvement Co.*, 39 Mich. 700:

"The object of this clause was not to limit, but to enlarge the corporate privileges, so that corporations whose existence for general purposes was nearing its end might enjoy the advantage of doing general busi-

ness during the whole charter period, instead of being compelled to begin winding up their affairs before it ended."

We much regret that counsel have permitted the apparently hostile personal feeling existing between Mr. Ruggles and Mr. Buckley to find expression in the supplemental briefs filed by them. Matters foreign to the record are referred to and the character of both of these parties, particularly Mr. Ruggles, is assailed in an unwarranted manner. Such matters are, of course, not considered by this court. They have no bearing on the merits of the controversy. We cannot but feel that on reflection counsel will themselves regret that their zeal has thus permitted them to indulge in such statements, which but detract from the ability displayed in their otherwise carefully prepared briefs.

After a careful reading of the entire record and giving due consideration to the claims of the plaintiffs, we are of the opinion that the decree rendered dismissing plaintiff's bill was justified. It is affirmed, with costs to defendants.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, and CLARK, JJ., concurred. BIRD, J., did not sit.