DIVISION 26 OF THE AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY & MOTOR COACH EMPLOYEES OF AMERICA v. CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS—EMPLOYEES' RETIREMENT SYSTEM—RULES AND REGULATIONS.

Employees of city who are members of municipal employees' retirement system as established by city charter and who are entitled to all of its benefits are likewise subject to all rules and regulations of the charter before and after its amendment whereby they were included (Detroit Charter, title 9, ch 6, art 5, §§ 1, 2).

2. SAME—EMPLOYEES' RETIREMENT SYSTEM—PRIOR SERVICE.

The power of municipal employees' retirement system board of trustees to exercise discretion in fixing the beginning date of prior service credit, found within the charter under which the system was established, must be exercised subject to the limitations expressed in the charter (Detroit Charter, title 9, ch 6, art 5, §§ 1, 2).

3. SAME—RETIREMENT SYSTEM—PRIOR SERVICE CREDIT.

"Service," as term is used in authorizing credit for prior service of a municipal employee as a member of the municipal employees' retirement system, relates only to service actually rendered (Detroit Charter, title 9, ch 6, art 5, §§ 1, 2).

4. SAME—CONTRACTS—EXECUTION—RETENTION OF BENEFITS.

Contract, not executed on behalf of city in manner provided by charter was void where city retained no benefits thereunder (Detroit Charter, title 4, ch 13, § 5).

---

REFERENCES FOR POINTS IN HEADNOTES
[1–3, 5] 40 Am Jur, Pensions, § 26.
[4] Generally as to effect of invalid contracts by municipal corporations, see 38 Am Jur, Municipal Corporations, § 505 *et seq.*
[6] 14 Am Jur, Costs, § 91.

5. SAME—BOARD OF STREET RAILWAY COMMISSIONERS—UNEARNED PENSION CREDITS.

Unearned pension credits may not be certified by city's board of street railway commissioners, where charter does not grant it power to do so.

6. COSTS—CONSTRUCTION OF CITY CHARTER.

No costs are allowed in suit for declaration of rights under agreement between union and municipal department of street railways, where construction of a city charter is involved.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted January 10, 1951. (Docket No. 62, Calendar No. 44,775.) Decided April 3, 1951.

Bill by Division 26 of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America and others against City of Detroit and others for decree fixing rights of plaintiffs to retirement benefits. Decree for defendants. Plaintiffs appeal. Affirmed.

*Edward N. Barnard,* for plaintiffs.

*Paul T. Dwyer,* Acting Corporation Counsel, *Bert Sogge,* Assistant Corporation Counsel, and *James S. Shields, Leon H. Harman* and *Julius C. Pliskow,* for defendants.

SHARPE, J. This appeal involves the claims of 619 employees of defendant department of street railways of the city of Detroit who were in such employment prior to 1940 to certain pension credits. Plaintiffs seek a declaratory judgment as to their rights in the matter.

Plaintiffs are members of Division 26 of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, a labor union affiliated with the American Federation of Labor. Defendants are the city of Detroit, a munici-

pal corporation; the board of street railway commissioners of the city of Detroit, a board created under title 4, ch 13 of the city charter which operates the street railway system; and the board of trustees of the retirement system of the city of Detroit which is vested with general administration of the retirement system.

The record shows that each year the street railway commissioners negotiated an "annual agreement" with the union fixing wages and working conditions of the transportation equipment operators from April 1st to March 31st of the following year. Each agreement contained a provision for arbitration, a clause fixing the pay rates of all employees on the basis of 1-man and 2-man operations and it was approved as to form by the commission's attorney and the corporation counsel. The annual agreement for the period April 1, 1947, to March 31, 1948, contained in its sections a provision called "no relief bonus" clause for premium payments to a transportation equipment operator who was not relieved from work when scheduled to be. The agreement also contained the following:

"The determination of the size and type of vehicles to be operated shall be vested exclusively in the department and the foregoing rates shall apply to the operation of all types and sizes of vehicles."

It also appears that in December, 1947, many of the employees of the department of street railways and plaintiffs herein had lost much time from their employment whereby their pension credits under the retirement system were adversely affected and such loss of time was in a measure due to conversion by the department of street railways from 2-man operation to 1-man rail and coach operations, thus creating a scarcity of work for men of limited seniority.

On or about December 30, 1947, plaintiff union entered into an agreement with the department of street railways to meet this situation. The agreement reads as follows:

"Between the city of Detroit, department of street railways and Division 26 of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America.

"Through the conversion of 2-man rail operation to 1-man rail and coach operation the department's man-power requirements have been reduced, creating a condition wherein there is a scarcity of work for men whose seniority is limited.

"During the depression years, and the years immediately thereafter, many employees still in service were temporarily separated from service or were unable to secure sufficient work to receive certification for pension credit. Many of these employees are unable to qualify as operators of 1-man equipment and the department is confronted with the task of providing other work for them. Many of them would now be eligible for retirement if they had not lost the full pension credit.

"The department of street railways realizing that many employees have been injured by this loss of pension credit, agrees, through its general manager, that it will in each instance certify for pension credit 11/12 of the time lost, with a maximum in each instance of 11/12 of 3 years.

"The union realizing that an undue burden has been placed upon the department through the application of the 10% limitation on trippers, and through the application of the 'no relief bonus', agrees, through its accredited president, business agent, and complete executive board, that it will recommend and do all in its power to substitute in subsequent agreements, 15% in place of 10% contained in present agreement covering the period to March 31, 1948 in that portion of section 14 which reads as follows: 'The number of trippers shall not exceed 10% of the

number of runs upon the system.' (The purpose of this being to provide a greater amount of work for extra men.)

"It will also recommend, and do all in its power, to eliminate in subsequent agreements subsections (a) and (b) of section 23 of present agreement covering the period to March 31, 1948, which reads as follows: '(a) In the event that an operator is scheduled to be relieved and is not relieved, he shall be required to complete his trip to the scheduled destination. If this operation requires additional scheduled time of less than 1 hour, the operator shall be allowed a premium of 30 minutes' time computed at straight time rate. If the operation requires additional scheduled time of 1 hour or more, the operator shall be allowed a premium of 1 hour's time computed at straight time rate.' '(b) If a transportation equipment operator is scheduled to pull-in and because of emergency agrees to continue work, he shall be compensated in the same manner as provided above in subsection (a).'

"The union further agrees the following 2 paragraphs of supplemental agreement of August 23, 1947, covering 1-man operation shall also be waived: 'The Michigan rail line will be continued as 2-man rail operation for a period of 3 years.' 'The Jefferson rail line will be continued as 2-man rail operation for a period of 3½ years, but 1-man operated coaches will be used at night and on Sundays and Holidays as soon as equipment deliveries and gasoline supplies make it possible.'

"It is specifically agreed that at any time the department may substitute trolley coaches, P.C.C. cars or motor coaches on the Michigan and Jefferson lines, but 1-man converted Peter Witt cars will not be operated on the Michigan line prior to August 23, 1950, or on the Jefferson line prior to February 23, 1950.

"Further, it is agreed that Division 26 will do nothing to interfere with the department's acquisition

of new equipment for the Michigan or Jefferson lines.

"The foregoing shall be considered and accepted as full payment of all back pay and pension claims which may now exist or which may arise in the future.

"CITY OF DETROIT

"DEPARTMENT OF STREET RAILWAYS

"FRANK RISING (signed)

"Vice-President

"E. J. HUDSON, Commissioner (signed)

"DIVISION 26—A.A.S.E.R. & M.C.E. OF A.

"STEPHEN SINGLER (signed)

President

"WALTER STANLEY (signed)

Business Agent

"Dated: December 30, 1947."

The supplemental agreement of August 23, 1947, mentioned in the above agreement reads as follows:

"CITY OF DETROIT

"DEPARTMENT OF STREET RAILWAYS

"*One-Man Operation*

"Agreement between Division 26, Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, and the department of street railways, city of Detroit.

"The purpose of the department of street railways is to furnish safe and efficient transportation to the residents of metropolitan Detroit. To that end it is improving its system of acquiring modern new vehicles, with the purpose of converting to an eventual all rubber-tired operation except on Woodward avenue or on future rapid transit lines.

"During the transition, in order to provide job security for those employees who are incapable of operating rubber-tired vehicles, the department proposes to convert a maximum of 200 Peter Witt streetcars to be operated on the various rail lines

until complete conversion from rail to rubber-tired operation is made.

"The union agrees to operate these Peter Witt cars, converted to 1-man operation, subject to the following to which the department agrees:

"1. A maximum of 200 Peter Witt cars will be converted to 1-man operation.

"2. Additional lines will be converted to 1-man operation only when a number of rail men equal to that which would be eliminated by 1-man operation, on the line scheduled for conversion to 1-man operation, have been retired or separated from service.

"3. Any employee qualified for rail operation only who for physical reasons, or any such employee having a minimum of 15 years of service with the department who by reason of his operating record is disqualified from further rail or coach operation will, if he so desires, be placed in other work by the department at the established rate of pay for the classification. He will be given the opportunity of continuing employment until he has completed 25 years of city service, or has reached the age of 60, whichever occurs first.

"4. The general superintendent of transportation will meet with any delegated representative of the union to review the record of any transportation equipment operator, not included in section 3 above, who is at present disqualified from 1-man rail or coach operation. Any of these who indicate possibilities of becoming successful operators will be given the opportunity of requalifying.

## "Continued 2-Man Operation

"Subject to public requirements, such as expressway construction or unforeseen developments, the department, as of August 23, 1947, agrees to operate the main part of the following lines with 2-man Peter Witt cars as follows:

"The Mack rail line will be continued as 2-man rail operation for a period of 2 years, with 1-man oper-

ated coaches being used at night and on Sundays and Holidays.

### "One-Man Operation Agreement

"The Gratiot rail line will be continued as 2-man rail operation for a period of 3 years, with 1-man operated coaches being used at night and on Sundays and Holidays.

"The Michigan rail line will be continued as 2-man rail operation for a period of 3 years.

"The Jefferson rail line will be continued as 2-man rail operation for a period of 3½ years, but 1-man operated coaches will be used at night and on Sundays and Holidays as soon as equipment deliveries and gasoline supplies makes it possible.

"The Baker rail line will be continued as 2-man rail operation as far as Davison avenue for a period of 4 years.

"The Oakland rail line will be continued as 2-man rail operation for a period of 5 years.

"Thereafter the union agrees to the operation of 1-man vehicles on all lines.

"Should any unforeseen circumstances develop which might necessitate a change in the above schedule, the matter will be negotiated with delegated representatives of the union.

### "Training

"Effective as of July 15, 1947, and continuing until October 31, 1947, all regular motormen and conductors who were or who will be qualified as coach operators, and all conductors who were or who will be qualified as motormen or coach operators, will be paid in the following manner:

"Any employee hired before January 1, 1945, will be paid his full rate for the qualifying period.

"Any employee hired subsequent to January 1, 1945, who had not completed his full training, will be paid 50¢ per hour for the period required to complete his full training.

"Any employee hired subsequent to January 1, 1945, who had completed his full training will be

paid his regular rate for the period required to complete his qualification.

"Before any line is scheduled for conversion to 1-man operation, delegated representatives of the union will be notified.

> "For the Department of Street Railway
> "RICHARD A. SULLIVAN (signed)

"For Division 26—AASER & MCE of A
"STEPHEN SINGLER (signed)
"WALTER STANLEY (signed)
"PAUL W. HILL (signed)
"Dated: August 23, 1947."

Following the filing of plaintiffs' bill of complaint, defendants filed an answer and a motion to dismiss the bill of complaint for the following reasons:

"1. The said bill contains a misjoinder of parties plaintiff. * * *

"3. The trial of this cause under the said bill of complaint would not avoid a multiplicity of suits.

"4. The said bill attempts to join together the individual claims of 619 persons each claim being based on its own averments of fact distinct and separate from the averments of fact relating to each of the other parties plaintiff with no one claim being identical on a factual basis with any of the others. * * *

"6. That the alleged contract being exhibit 'A' (December 30, 1947) which is attached to the said bill of complaint and upon which the cause of action stated is alleged to rest is an illegal and unlawful contract and is invalid and therefore the said plaintiffs' alleged causes of action fail."

The issues being framed, the cause came on for hearing, testimony was taken and the trial judge entered a decree dismissing plaintiffs' bill of complaint. Prior to entering a decree the trial court filed an opinion which contained a finding of facts:

"On August 23, 1947, a so-called agreement (exhibit 4) was entered into by Division 26 and was

executed 'for the Department of Street Railways, Richard A. Sullivan.' It consists of statements and of promises, unsupported by any consideration whatsoever, which purport to limit the powers of the commission over its streetcar operations. It contains the statement that 'the union agrees to operate these Peter Witt cars, converted to 1-man operation, subject to the following, to which the department agrees.' * * * At best, this was no more than a second promise to do what had already been promised in the April 1, 1947 agreement.

"This so-called agreement of August 23, 1947 was not made in the name of the city of Detroit, was never approved by nor authorized by the street railway commission, nor executed by its president and secretary, all of which is required by title 4, ch 13, § 5 of the city charter.

"For these reasons, and especially for the want of consideration and the want of such approval or authorization, it cannot be the legal contract of the street railway commission. Legally it is a mere nullity.

"On December 30, 1947, the street railway commission and Local 26 entered into the agreement annexed to the bill of complaint as exhibit 'A'. In the December 30, 1947 agreement, Division 26's promise to waive any portion of the void August 1947 agreement cannot be sufficient consideration for the December 30, 1947 agreement.

"Similarly, the union's promise to permit the commission to substitute trolley coaches, PC cars, motor coaches on the Michigan and Jefferson lines, and to do nothing to interfere with the department's acquisition of new equipment for the Michigan-Jefferson lines, granted the commission nothing more than what it had under the April 1, 1947, agreement, there being no showing in this case of any right of the union to so interfere. The union's 'waiver' of 'all back pay and pension claims' is not shown to have been the waiver of any actual, existing claim, nor

to have been authorized by any individual possessing such a claim.

"These portions of the December 30, 1947 agreement do not constitute valid consideration for the portion of this agreement upon which plaintiffs rely for their claims for additional pension credits.

"The court finds as a fact, from the undisputed testimony of Kramer, that Local 26 not only did nothing to carry out those provisions of the December 30, 1947 agreement relative to the 'no relief bonus,' but actually violated it in this respect. (See exhibit 14.) The court finds that this constitutes a material breach of the December 30, 1947 agreement so as to itself prevent plaintiffs' enforcing it, and to deny any pension credit claims based on it. These claims are based on the following language of the December 30, 1947 agreement:

" 'The department of street railways realizing that many employees have been injured by this loss of pension credit, agrees, through its general manager, that it will in each instance certify for pension credit 11/12 of the time lost, with a maximum in each instance of 11/12 of 3 years.' * * *

"Originally, title 9, ch 6, of the charter (entitled 'general retirement system') did not apply to the employees of the street railway commission (title 9, ch 6, art 2, § 2[d]) These employees became subject to the pension system by amendment to the charter in November, 1939, and section 2 (d) of the amendment provides: 'In event the employees of the department of street railways are later included in the retirement system, service rendered by the employees of the department of street railways prior to the effective date of the agreement' * * * shall be credited as 'prior service' in their 'prior service certificates,' that, under certain conditions, credit for 'membership service' shall be reduced and that the total pension for 'prior service' and 'membership service' should not exceed $1,800. It is elementary that this amendment must be read in conjunction with the rest of the chapter and as a part of the

whole. It is clear that section 2 (d) could not authorize the street railway commission to institute its own pension plan, nor to credit its employees, arbitrarily, with service for pension purposes. On the contrary, the definitions in sections 7, 8 and 9 of article 7, are adopted in section 2 (d); and 'service' means services paid for by the city. It must be plain that the employees of the commission could only claim benefits under the retirement system in strict compliance with the provisions of amended chapter 6. As previously pointed out, the method of certifying service is specified, and could not include time or service not actually rendered and paid for. Being thus limited, the street railway commission could not contract to exercise such power as claimed by the plaintiffs. If the so-called contract of December 30, 1947 were not void for reasons previously outlined in this opinion, such provisions would be clearly void.

"Moreover, the board of trustees of the pension system are specifically forbidden by section 2, et seq. of article 5 of chapter 9 of the charter to allow credit for such 'service' as claimed by plaintiffs here, even though certified to it by the DSR.

"In conclusion, the court holds that the contract of December 30, 1947, is void for the reasons heretofore stated. The temporary restraining order previously issued is dissolved, and plaintiffs' petition for an injunction is denied, the motion for declaratory judgment being dismissed."

The paramount issue in this cause is the validity of the December 30, 1947, contract. Plaintiffs urge that this contract is founded on adequate consideration in that the department of street railways promises to allow certain pension credits to members of the union in exchange for certain promises made by the union in behalf of its members.

Defendants urge that the agreement dated December 30, 1947, is void as the commission had no power to enter into such an agreement as to certifications

or to make pension certificates under it in that the charter provisions as to pensions did not authorize the street railway commission to enter into such an agreement; that the commission had no power to certify service not actually rendered or to agree to so certify; and that the street railway commission cannot exercise any legislative power or validly contract to exercise any legislative power. Defendants also urge that assuming the December 30, 1947, contract is valid, plaintiffs have failed to comply with its terms and have materially breached it in that the following contained in the 1947 agreement—

"The union realizing that an undue burden has been placed upon the department through the application of the 10% limitation on trippers, and through the application of the 'no relief bonus', agrees, through its accredited president, business agent, and complete executive board, that it will * * * recommend, and do all in its power, to eliminate in subsequent agreements subsections (a) and (b) of section 23 of present agreement covering the period to March 31, 1948 which reads as follows: '(a) In the event that an operator is scheduled to be relieved and is not relieved, he shall be required to complete his trip to the scheduled destination. If this operation requires additional scheduled time of less than 1 hour, the operator shall be allowed a premium of 30 minutes' time computed at straight time rate. If the operation requires additional scheduled time of 1 hour or more, the operator shall be allowed a premium of 1 hour's time computed at straight time rate.' '(b) If a transportation equipment operator is scheduled to pull-in and because of emergency agrees to continue work, he shall be compensated in the same manner as provided above in subsection (a)' "—

was breached by the union's written proposal of the "no relief bonus" clause in 1948–1949 annual agreement which provisions were identical with the pro-

posal that plaintiffs by the 1947 agreement agreed to "do all in its power, to eliminate in subsequent agreements" and that by their actions both parties did not consider the 1947 agreement in effect.

We shall first discuss the legality of the 1947 agreement.

Title 9, ch 6 of the charter of the city of Detroit creating a retirement system contains the following:

"Article 1

"A retirement system for employees of the city of Detroit is hereby established for the purpose of providing retirement allowances and death benefits for employees of the city under the provisions of this amendment to the charter of the city of Detroit. The effective date of the retirement system shall be the first day of July, 1938.

"Article 2

"Sec. 1. There is hereby created a board of trustees of the retirement system, in whom is vested the general administration, management and responsibility for the proper operation of the retirement system and for making effective the provisions of this charter amendment. The board of trustees shall be organized immediately after 5 of the trustees, provided in this article, have qualified and taken the oath of office. * * *

"Sec. 7. Subject to the limitations contained in this charter amendment, the board of trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this charter amendment and for the transaction of its business. * * *

"Article 3

"Sec. 2. * * * (d) In event employees of the department of street railways are included in the membership of the retirement system, service rendered by the employees of the department of street railways prior to the effective date of the agreement, referred to in paragraph (c) of this section, shall

be credited as prior service in their prior-service certificates. An employee who has been in the employ of the department of street railways prior to January 1, 1940, shall receive in lieu of that part of his pension provided for in paragraph (c), § 2, article 6 of this chapter, as many thirtieths, not to exceed 30/30 of ½ of his average final compensation as the board of street railway commissioners shall certify in writing to the board of trustees of the retirement system, provided that if the number of thirtieths certified by the board of street railway commissioners for a member when added to the proportion which his years of membership service bears to 30 years, exceeds 30/30, credit for his membership service shall be reduced, provided further that the total pension for prior service and membership service shall not exceed $1,800 per annum. Contribution necessary to maintain the required reserves for pensions for employees of the department of street railways shall be an obligation of the department of street railways and shall be made to the retirement system from funds of the department of street railways, in quarter annual instalments, the first instalment to be made not later than 30 days after the effective date of the agreement by which the employees of the department of street railways are included in the membership of the retirement system.

"(Adopted November 7, 1939. In effect November 14, 1939.)   *   *   *

"Article 5

"Sec. 1. Under such rules and regulations as the board of trustees shall adopt, each member, who was an employee on July 1, 1931, and who becomes a member thereafter, shall file a detailed statement of all service, rendered by him as an employee prior to the effective date of this charter amendment, for which he claims credit, and of such other facts as the board of trustees may require for the proper operation of the retirement system.

"Sec. 2. The board of trustees shall fix and determine by appropriate rules and regulations how much

service in any year is equivalent to a year of service, but in no case shall less than 6 months' service constitute 1 year, nor shall more than 1 year of service be creditable for all service in 1 calendar year. The board of trustees shall not allow credit as service for any period of more than 1 month's duration during which the employee was absent without pay; provided, that a member transferred from the city payroll, to the payroll of any city, county, State government, or the Federal government, by his department head to serve the interests of the city, during peace times, then such member shall continue to be a member of the retirement system and shall be required to make regular contributions into the annuity savings fund; provided further, that if a member, so transferred, fails to make contributions into the annuity savings fund for 3 consecutive months, he shall cease to be a member of the retirement system 4 months (of 31 days each) after the due date of his first defaulted annuity contribution."

Since November 14, 1939, employees of the department of street railways have been under the provisions of the retirement system and are entitled to all of its benefits. Likewise, the employees are subject to all rules and regulations of the charter prior to and subsequent to the amendment. See *People, ex rel. Attorney General,* v. *Michigan Central Railroad Co.,* 145 Mich 140.

Article 5, §§ 1, 2, of the retirement system amendment authorizes the board of trustees to adopt rules and regulations and requires certain amounts of service to be actually performed to make a year's service for an employee.

In *Hubbard* v. *Board of Trustees of Dearborn Retirement System,* 319 Mich 395, we had occasion to construe the powers of the board of trustees of the Dearborn retirement system. We there said:

"The powers of the board to exercise discretion in fixing the beginning date of prior service credit

must be found in the ordinance itself and are subject to its limitations thereon. *In re Application of Joe Brown & Sons,* 273 Mich 652; *Sovey* v. *Ford Motor Co.,* 279 Mich 313. The definitions contained in the ordinance must be given full force and effect. *People* v. *Harrison,* 194 Mich 363; *People* v. *Smith,* 246 Mich 393; *Acme Messenger Service Co.* v. *Unemployment Compensation Commission,* 306 Mich 704.

"Under the ordinance annuities are to be paid to retiring members on the basis of number of years of creditable service, which consists of membership service and service rendered prior to the effective date of the ordinance. The word 'service' is defined in the ordinance to mean service rendered as an employee in the general classified civil service. There having been no general classified civil service in effect prior to November 18, 1935, no service, as defined in the ordinance, could have been performed prior to that date. In the computation of annuities, credit may not be allowed for work done for the city prior to that date."

See, also, *Baumgartner* v. *Michigan Public School Employees' Retirement Fund Board,* 327 Mich 36.

It follows that the board of trustees must follow the rules of the retirement system and that the only service that can be credited as "service" for a pension is service actually rendered.

The street railway commission came into existence by virtue of the city charter. The limitation of the powers of the street railway commission may be found in title 4, ch 13, §§ 5 and 13, of the charter of the city of Detroit.

Plaintiffs urge that defendants may not avoid liability because of the manner of the execution of the contract dated December 30, 1947. The above contract was executed in the name of the city of Detroit and signed by the vice-president and a commissioner of the department of street railways board. The above contract was not approved by the common

council of the city of Detroit as is provided for in title 4, ch 13, § 5, of the charter of the city of Detroit.

Plaintiffs rely on *Hatch* v. *Maple Valley Township Unit School,* 310 Mich 516. In this case plaintiffs furnished labor and materials for the construction of a school building. Defendant school district refused to pay because the amount of money voted by the school district had already been expended. Defendant contended that there was no liability in excess of the sum voted by the school district. In affirming a judgment for plaintiffs we quoted with approval from *Webb* v. *Township of Wakefield* (syllabi), 239 Mich 521, as follows:

" 'In an action on a contract which is not *ultra vires,* a municipal corporation may not shield itself behind a defense based on the manner in which the contract was made, and retain the benefits of the contract, without tendering at least a reasonable compensation for the benefits received.' "

Let us examine the record and determine what benefits defendant retained. Under the contract of December 30, 1947, the department of street railways agrees to certify for pension credit 11/12 of the time lost, with a maximum in each instance of 11/12 of 3 years. The union agreed to do all in its power to eliminate the "no relief bonus" clause from and increase the tripper limitation in future annual agreements. When the department of street railways agreed to certify unearned benefits, it cannot be said that such certification was a benefit retained by the city of Detroit. Moreover, the union did nothing to carry out its agreement relative to the "no relief bonus" clause. In our opinion the *Webb Case* has no application to the facts in the case at bar as there were no benefits retained by the city of Detroit. The board of street railway commissioners, being a creature of the Detroit city charter, has no power except

as is provided in the charter. The charter grants no power to the officials of the board of street railway commissioners to certify unearned pension credits. It follows that the agreement of December 30, 1947, is void for lack of approval by the common council and because the city could not enter into a contract in violation of the rules of the retirement system granting credit for service not rendered. The agreement of August 23, 1947, purports to limit the powers of the board of street railway commissioners over its transportation operations. The agreement was signed in behalf of the department of street railways by Richard A. Sullivan. It was not authorized or approved by the board of street railway commissioners or approved by the common council as is provided in title 4, ch 13, § 5 of the city charter.

It follows that the decree of the trial court should be and is affirmed, but without costs as the construction of a city charter is involved.

REID, C. J., and BOYLES, NORTH, DETHMERS, BUTZEL, CARR, and BUSHNELL, JJ., concurred.